(No. 53425.—

(No. 53547.—

JOYCE ANN MURPHY, Appellee, v. MARILYN URSO *et al.*, Appellants.

*Opinion filed December 18, 1981.—Rehearing denied January 29, 1982.*

448

Baker & McKenzie, of Chicago (Francis D. Morrissey, Norman J. Barry, Jr., and Richard H. Donahue, of counsel), for appellant The Traveler's Indemnity Company of Illinois *et al.*

Raymond R. Cusack, of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellant Marilyn Urso *et al.*

George T. Murphy, Jr., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

These consolidated cases arose from the same incident—a traffic accident in which Joyce Murphy was injured when the van in which she was riding and which was traveling at excessive speed struck several parked cars. In cause No. 53547, Murphy sued the driver, James Clancey, and the van's alleged owners, Marilyn Urso, operator of the Edgewater Pre-school, and Edgewater Primary School, Inc. She alleged that Clancey was negligent and that he was acting as the agent of the other defendants. Subsequently, Murphy amended her complaint by adding a second count against Urso and her schools alleging wilful and wanton or negligent entrustment of the van to Clancey. The plaintiff obtained a default judgment against Clancey, then brought a garnishment action (cause No. 53425) against the Trav-

elers Indemnity Company of Illinois and the Travelers Insurance Company (Travelers), Urso's business insurer.

The circuit court of Cook County granted summary judgment against Murphy on the grounds that Clancey was not operating the van within the scope of his employment and that Urso had not entrusted the use of the van to him. In the garnishment action, the court found that Travelers was estopped from denying insurance coverage of Clancey under Urso's policy, because Travelers had refused to defend the suit against Clancey. The appellate court reversed Urso's summary judgment and remanded the accident case for trial but affirmed the judgment, with one judge dissenting, against the insurer. (83 Ill. App. 3d 779.) This court granted leave to appeal under Rule 315 (73 Ill. 2d R. 315).

I

## THE INSURANCE CASE: ARE THERE CONFLICTS OF INTEREST?

Chronologically, the first issue the various parties in these cases reached was whether Travelers had to defend Clancey in the suit filed against him by Murphy. The resolution of that issue is tied to the allegations of Murphy's complaint and the potential liability it presented. To best examine the issue it is necessary to explore the procedural background of the two cases.

Clancey did not respond to the initial Murphy complaint, and after the appropriate length of time had passed a $750,095 default judgment was entered against him. Ms. Murphy then filed her garnishment suit against Travelers seeking payment from the business insurance policy issued to Ms. Urso's schools. Ms. Murphy claimed in the garnishment action that Clancey was covered by the policy as a permissive user of the preschool's bus. Travelers tried to deny coverage of Clancey on this ground, but Ms. Murphy urged that Travelers was estopped from denying coverage because it had failed to defend Clancey, its insured, in the

underlying suit.

The garnishment suit lay dormant until the circuit court granted summary judgment against Murphy in the underlying accident case. At that point both Ms. Murphy and Travelers moved for summary judgment in the garnishment action. Travelers argued that the judgment in the accident case settled the question of Clancey's authority to use the bus. But the circuit court held that Travelers was estopped from making any policy defenses and awarded the full amount of the default judgment, plus interest, to Ms. Murphy—a total of $854,000. This was in excess of the $100,000 policy limits.

The issue presented in this part of the appeal is whether Travelers was estopped from denying policy coverage. A guide to the levels of contention would be helpful in understanding the arguments and responses of Ms. Murphy and Travelers. First, she claimed that Travelers should pay the judgment against Clancey because, as the driver of the vehicle, he fell under its policy of insurance. Travelers responded that Clancey was not covered because he had no permission to use the bus at the time of the accident. Second, Ms. Murphy retorted that Travelers could not raise that defense because it had failed to provide Clancey with a defense in the accident case. It was therefore estopped from raising the question of permission and denying coverage. Travelers answered that it was not estopped because it had a conflict of interest with Clancey. Under existing Illinois law, such a conflict excused it from taking on Clancey's defense itself. Third, Ms. Murphy claimed that the conflict of interest did not prevent Travelers from determining whether there was permission and thus policy coverage in a declaratory judgment action, and that Travelers should have taken that route rather than simply declining to give Clancey a defense. Travelers answered that such an action was inappropriate for a case like this, because of the procedural shifts that would occur and

because of the effect of collateral estoppel. Fourth, Ms. Murphy countered that she did not mind the procedural shifts and that collateral estoppel would not have operated in any event. Travelers disagreed. Such are the four levels of argument involved in this segment of the appeal, although skirmishes occur in addition on every level.

The first level of argument is quickly disposed of. If the policy extended to Clancey, Travelers would be liable; the reason is Clancey's negligence could not be realistically contested. Ms. Murphy, who stood in Clancey's shoes for purposes of the garnishment action, conceded that the accident occurred when Clancey slammed into parked cars while rounding a corner too wide and too fast. No other factor was involved in the accident except perhaps Clancey's sobriety—he and Ms. Murphy had spent 2½ hours in a bar just before the accident. Here, therefore, the only question was policy coverage, and the parties clashed over whether Travelers would be permitted to raise its policy defense that Clancey was using the van without permission.

We thus move to the second level and begin our analysis of the case with the familiar general rule of estoppel. An insurer taking the position that a complaint potentially alleging coverage is not covered by a policy which provides that the insurer has the right and duty to defend any claims brought against the insured cannot simply refuse to defend the insured. It must defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. If the insurer fails to do this, it is estopped from later raising policy defenses to coverage and is liable for the award against the insured and the costs of the suit, because the duty to defend is broader than the duty to pay. (*Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 199.) But, this case turns on an exception to the general rule. An insurer must decline to defend where there is a conflict of interest between it and the insured. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 152; *Maryland Casualty Co. v. Peppers*

(1976), 64 Ill. 2d 187, 198-99.) Instead of participating in the defense itself, the insurer must pay the costs of independent counsel for the insured. (74 Ill. 2d 132, 162; 64 Ill. 2d 187, 199.) And, had Clancey requested a defense, Travelers would have been obligated to pay the costs. The starting point of analysis under either the general rule of estoppel or the exception is the same—the allegations of the complaint and the policy issued by the insurer. To these we turn.

Travelers issued a comprehensive insurance policy, including both general liability and automobile insurance sections, to the schools. The policy obligated the insurer to pay on behalf of the insured all damages due to bodily injury arising out of the use of, among other things, the van involved in the accident. The policy's coverage extended to persons using the van with permission of the named insured. Travelers was given the right and duty to defend any suits against the insureds.

Ms. Murphy filed her initial complaint on August 10, 1972. Characterizing Clancey as the agent of Ms. Urso and the preschool, she charged the defendants, including Clancey, with wilful and wanton or negligent conduct, primarily due to Clancey's driving. The default judgment against Clancey, who was served through the Secretary of State, was entered when he made no appearance.

Although an amended complaint was later filed which for the first time added a count alleging negligent entrustment, it was the first complaint that was on file when the failure to present any defense resulted in the default against Clancey. Thus it is that complaint alone to which we turn our attention. (*La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 452.) It alleged that Murphy's injury was caused by faulty driving of the preschool's bus by an agent—therefore one with permission—of the named insured. The complaint presented the issues of negligence, causation, and the relationship between Clancey and Urso. Of these, the relationship between Clancey and Urso—

raising the question of whether Clancey had permission to use the van—was the principal contested issue. The complaint presented a case of potential coverage, and the general rule of estoppel was triggered. Travelers learned of the suit against Clancey when Ms. Urso tendered the preschool's defense to it, and it then had a duty to provide a defense to its insured, Clancey and the schools.

But which one? An analysis of the possibilities reveals the dilemma in which Travelers found itself. It controlled both defenses. To best defend the preschool, it would try to show that Clancey did not have permission to use the bus at the time of the accident. To do this, it had to show either that he had been discharged or in any event was not operating within the scope of his employment, or that he had no explicit or implicit approval to use the bus. This would sever any connection between the preschool and Clancey, place all the liability on Clancey, and exonerate the school. But to best serve Clancey, Travelers had to try to show that he did have permission to use the bus. This would spread the liability to the schools. It was in Clancey's interest, then, to show that he had not been fired and that his use of the bus was within the scope of his employment, or that he had received approval for the use of the bus to help Ms. Murphy move.

The interests of Ms. Urso's schools and Clancey in how the suit was to be defended were diametrically opposed, creating an ethical conflict for Travelers, which was charged with providing a full and vigorous defense to each. (See 79 Ill. 2d, Code of Professional Responsibility, R. 5—105.) In order to defend either the schools or Clancey, Travelers had to resolve the conflict and pick a strategy of defense. How could it do so for one without harming the other?

But Travelers had an even more fundamental problem— the conflict between its own interests and Clancey's. If it could prove Clancey had not been negligent, or did not cause the accident, strategies which would probably be

unsuccessful, Travelers could sidestep the conflict of interest and proceed with a defense of both the schools and Clancey. But failing that, Clancey's interest lay in siding with the plaintiff and shifting liability to Ms. Urso's schools so that the insurance would pay any judgment Ms. Murphy was awarded against Clancey. Travelers' interest lay in separating Clancey from the schools so that he would bear the entire liability. The balance hung, again, on what could be proved about permission—the scope of Clancey's employment and the extent of his approval to use the bus. The permission issue presented a fundamental conflict between the insurer and the putative insured (Clancey) whose interest it controlled. (See 79 Ill 2d, Code of Professional Responsibility, R. 5—101.) How could Travelers control Clancey's defense, acting on his behalf, when Travelers' interest would be best served by placing all the blame on Clancey?

The exception to the general rule of estoppel provided a way out of Travelers' ethical labyrinth. As stated above, it provides that, because of the serious ethical problems involved, the insurer facing a conflict of interest with its insured in the conduct of the insured's defense is not obligated or permitted to participate in the defense. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 152; *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 198.) Travelers had only to underwrite the costs of whatever defense Clancey chose to make. (74 Ill. 2d 132, 152.) It makes no difference that here the confict was with a putative insured instead of directly with the named insured, as in *Thornton* and *Peppers*. An argument over exclusion from policy coverage is, for these purposes, really no different from an argument over inclusion. The particulars of the conflict of interest do not matter, only the fact that there is a conflict at all. The insured has the right to be defended by counsel of his own choosing. A ruling that required an insured to be defended by what amounted to his enemy in the litigation would be

foolish.

But the plaintiff, at the third level of argument, claims that the insurer should still have been estopped here, because she contends that this is not the kind of case the exception was created for. She asserts that while the conflict of interest may have foreclosed a defense under a reservation of rights, the insurer could still have resolved the question of coverage prior to choosing a strategy of defense by bringing a declaratory judgment action. This would have resolved whether Clancey had permission to use the van, and the reasons for the conflict with Clancey would have disappeared, allowing Travelers to then undertake his defense in the suit brought by Ms. Murphy. Because it did not seek a declaratory judgment and did not defend Clancey, the plaintiff asserts, Travelers should now be estopped from denying that Clancey was covered by the policy.

But a declaratory judgment action was not an acceptable vehicle here. Where the issues in an underlying suit and a declaratory judgment action are separable, deciding the question of coverage in a collateral proceeding prejudices no party. The situation changes when the issues are substantially the same, as in this case where the principal contested issue is Clancey's permission to use the van. (Note, *Use of the Declaratory Judgment to Determine A Liability Insurer's Duty To Defend—Conflict of Interests*, 41 Ind. L.J. 87, 106 (1965).) The doctrine of collateral estoppel would be applicable, and consequently the result of the declaratory judgment would be controlling in the underlying suit, especially on the issue of whether Urso and her schools could be held liable on the only theory alleged in the original complaint—agency. (*Williams v. Madison County Mutual Automobile Insurance Co.* (1968), 40 Ill. 2d 404, 407.) Declaratory judgment would be only a forerunner of the accident trial, and would resolve nothing different.

There is no reason in such a case to require the insurer to engage in a useless and unnecessary exercise. Declaratory

judgment in this setting would be premature. (*Allstate Insurance Co. v. Gleason* (1964), 50 Ill. App. 2d 207, 215, cited in *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 197.) It would also prejudice the insurer by forcing upon it, as plaintiff, the burden of proof. Normally an insurer is not forced to take on this burden, but has the option as well of electing instead to defend under a reservation of rights, an option that is closed to the insurer here because of the conflict of interest.

As *Thornton* put it:

"In such a proceeding, an issue crucial to the insured's liability in the personal injury action *** would be determined in a purely ancillary proceeding with the plaintiff and defendant in the personal injury action both aligned on the same side as defendants in the declaratory judgment action. Also, the order and burden of proof would be oriented to and dictated by the declaratory judgment action and not by the primary litigation, the personal injury suit." (74 Ill. 2d 132, 159.)

The plaintiff would also be prejudiced by losing the opportunity to control the venue and timing of the suit, an important consideration where court calendars are clogged. Because the doctrine of collateral estoppel would preclude relitigation of the only issue in the case which could realistically be contested, whether Clancey had permission to use the van when the accident occurred, Travelers should not have been required to institute a declaratory judgment action.

The plaintiff says that she would have accepted the procedural disadvantages. To buttress her contention that Travelers was obligated either to resolve the question of coverage through a declaratory judgment action or defend Clancey, she advances to the fourth and final level of argument, contending that collateral estoppel would not have operated here because the issues would not be the same in both proceedings.

She is mistaken. Collateral estoppel operates at least

where there is an identity of parties and issues. (*Smith v. Bishop* (1962), 26 Ill. 2d 434, 437.) Those requirements would have been satisfied here. The parties in a declaratory judgment action would have been the insurer, Ms. Murphy, Clancey, Ms. Urso and the schools. In the accident case the parties are the same except for the insurer. But because the insurer has the duty to control the defenses of its putative and named insured, it too would have been estopped by a declaratory judgment. (See *Greenlee v. John G. Shedd Aquarium* (1977), 66 Ill. 2d 381, 385; *Smith v. Bishop* (1962), 26 Ill. 2d 434, 439 (Schaefer, J., dissenting).) There was, therefore, identity of parties.

There was also identity of issues. A declaratory judgment action would have decided whether Clancey was covered by the policy. That depended on whether he had permission to drive the bus at the time of the accident, and would hinge on whether he had been fired, the scope of his employment if he had not been fired, and whatever approval he had obtained to use the bus to help Ms. Murphy move. The principal issue in the accident case was identical. Ms. Murphy would be litigating precisely the same issue in each case-permission in its various guises.

To summarize, we work our way back through the levels of argument. Collateral estoppel would have applied if a declaratory judgment action was brought, and so such an action would have been premature, not a viable alternative for the insurer. The accident trial would only have been a rerun of the insurance trial, duplicating the issues under a different set of burdens. Travelers, which had a conflict of interest with Clancey, was not required, therefore, to bring a declaratory judgment action to determine coverage. At the same time, it could not defend under a reservation of rights because it was caught in the conflict of interest between the schools, Clancey, and itself. Travelers' only option was to decline to defend Clancey itself, remaining liable for the costs of whatever defense Clancey himself

chose to make. Because it was not allowed to defend Clancey, it was not estopped from denying coverage in the garnishment action even though Clancey had suffered a default. The exception announced in *Thornton* and *Peppers* to the general rule of estoppel controls this case.

The plaintiff's last contention seeks to distinguish *Thornton* and *Peppers* on the ground that here a defense was never tendered for Clancey by anyone. Plaintiff decries the prejudice that Clancey thus incurred—because of the conflict of interest the insurer did not defend him and when Clancey himself did not appear, no defense was made on his behalf. Thus, Clancey suffered a substantial judgment against him, and Travelers has escaped having to pay the costs of a defense. We acknowledge the windfall to Travelers, but point out that it happened solely because Clancey defaulted by failing to appear or to request Travelers to defend him. If Clancey had such a low regard for his own rights, the windfall that Travelers received is no reason to alter either the general rule of estoppel or the exception to it triggered by a conflict of interest.

For the reasons stated, this case falls within the exception enunciated in *Thornton*. Conflicts of interest with the putative insured relieve the insurer from his defense. But this exception is not meant to swallow the general rule requiring the insurer to provide its insured with a defense when the coverage is potential. Only where actual conflicts of interest appear is the general rule relaxed. Such a conflict exists here. The summary judgment in favor of Murphy in the garnishment action is therefore reversed. The policy defense to coverage on the basis of nonpermissive use—the very first point of argument—is yet to be litigated by the parties. The garnishment action must therefore be remanded to the circuit court for further proceedings in which Travelers may assert its policy defenses with respect to whether Clancey had permission to use the vehicle at the time Ms. Murphy was injured.

## II
### THE ACCIDENT CASE:
### ARE THERE ISSUES OF FACT?

The underlying action (cause No. 53547) was submitted to the circuit court on both the plaintiff's and the defendant's motions for summary judgment and on the affidavits and depositions of various witnesses. Because of the issues raised it is necessary to discuss the evidence in more detail.

Clancey was not deposed and did not file any affidavits. As a result his side of the story has never come to light. Clancey's driving record was presented by the plaintiff. It showed three convictions for speeding and another for failure to yield the right-of-way. Clancey's license had been suspended for 2 months at one point and was revoked after the accident.

Ms. Murphy was the passenger in the van when it crashed. As plaintiff, she offered affidavits and also a copy of her deposition. She said in the deposition that the accident occurred after a long evening of moving furniture. Two weeks before, Clancey had told her that he would have the use of two of the preschool's buses to help her move. Ms. Murphy had ridden with Clancey in the buses before as a passenger and accepted his offer of assistance. She, her roommates, several friends, and Clancey began moving at 5:15 p.m. on September 1, 1971; they retired to a nearby pub about 11 p.m. to relax after most of Ms. Murphy's furniture had been moved. Two vans from the Edgewater Pre-school had been used in the moving, and everyone but Ms. Murphy and Clancey drove home in one about 12:45 a.m. Around 1:30 a.m. Ms. Murphy and Clancey got into the remaining van to drive the few blocks home, but Clancey turned too wide and too fast and slammed into parked cars. Ms. Murphy blacked out and woke up on someone's lawn. She suffered various injuries, including a broken pelvis and a concussion.

Marilyn Urso, a defendant, was president of Edgewater

Pre-school, Inc., and a principal shareholder in Edgewater Primary School, Inc. The bus involved was a van, one of three owned by the preschool. Clancey worked for the preschool as a bus driver. The three buses each made three runs each day: one in the morning, another at noon, and a third in the evening. At the end of each run the drivers were to take the buses to a service station and park them there. The keys were kept in the station office.

Ms. Urso stated that the bus drivers were never permitted to use the vehicles for personal reasons and that Clancey did not receive permission to use the bus the night the accident occurred. She knew of no occasion when Clancey had ever before used the bus for his own personal reasons.

According to Ms. Urso, Clancey was fired the day before the accident. The preschool's enrollment was down and Ms. Urso thought Clancey was the least promising prospect among the drivers. The actual discharge was handled by Joanne Chandler, the director of the preschool. In an affidavit Ms. Urso said that Clancey had been fired, took the bus without her consent, permission or knowledge, and was using it to move furniture, a purpose totally unrelated to its designated use to transport students.

Joanne Chandler's deposition was offered by Ms. Urso. In it, Ms. Chandler said that Clancey was supposed to report to her. The buses were supposed to be parked at the station when not out on a run. Twice she had received word that the bus Clancey drove had been seen out at night, and had reported the incidents to Ms. Urso. She and Ms. Urso confronted Clancey with the reports. He admitted using the bus once for personal reasons but denied the second report. Clancey was told not to remove the bus from the station again after working hours. Ms. Chandler favored firing Clancey but was overruled by Ms. Urso. Ms. Urso called the service station and said that the buses were to be parked there after the evening runs and that no one was to remove

them until the next morning.

According to Ms. Chandler, Clancey was fired before his noon run the day of the accident. Clancey had completely missed his morning run. When Clancey arrived at the school, Ms. Chandler told him that she thought he was totally unreliable and that as far as she was concerned he was terminated then and there. Clancey was given his accrued wages by check, and he threw the keys to the van on Ms. Chandler's desk. Ms. Chandler told Ms. Urso by phone that she had fired Clancey. At the time Clancey left, the van was parked at the service station. Ms. Chandler took its keys home with her that night, only to learn the following day of the accident. She did not know how it had been driven, since she had the keys.

Pamela Sabo was one of Clancey's fellow drivers. In a deposition offered by the plaintiff, she characterized Clancey as a wild man who liked to take chances but who did not have very good luck.

Ms. Sabo reported to Ms. Chandler. Ms. Sabo said she had been told by Ms. Chandler that the bus she drove belonged in the station on weekends. The rest of the time Ms. Sabo parked it as close to her home as possible, so she could get at it easily the next morning. Clancey followed a similar practice. During the day, the bus was there for Ms. Sabo's personal use. She at times used it to run errands, once including an errand for Ms. Urso. Ms. Sabo thought that Ms. Urso and Ms. Chandler knew what was going on—she felt that the authorization for the personal use of the vehicles was implied, because she was never told not to do it. At one point either Ms. Urso or Ms. Chandler told her that if she were going to use the bus for personal reasons she would have to put gas in it. Only after the accident was the word passed that the buses were to be kept in the station when not out on a run.

Ms. Sabo said that on the day of the accident she helped Joyce Murphy move her furniture. She halted about 3:30 or

4 p.m. and returned the bus to the preschool for the evening run. Clancey had also been moving furniture with his bus; Ms. Sabo could not remember if Clancey followed her back to the preschool for the evening run. But nothing out of the ordinary occurred in taking the children home that day, so Ms. Sabo assumed that Clancey made his evening run. She met him back at the apartment where the furniture was being removed. Clancey had his bus with him again.

Ms. Sabo said that Clancey told her he received permission from Ms. Urso to use the buses to help move Ms. Murphy's furniture, and that he was surprised that he had received Ms. Urso's approval. He told Ms. Sabo that he was surprised that "she didn't give him any grief."

The plaintiff offered the affidavit of Sue Tario, although Tario's exact relationship with the parties was not explained. Ms. Tario said that following the accident Thomas Coleman, Clancey's replacement, used his bus on one occasion to drive her to the theatre. Thomas Coleman's affidavit was also offered by the plaintiff.

Before the accident he learned that Clancey was planning to quit driving for the preschool on September 15, 1971. Coleman and Ms. Urso arranged for Coleman to take Clancey's place beginning on that day. A few days before the accident Coleman reconfirmed his starting day with Ms. Chandler. On the day of the accident Coleman saw Clancey driving the bus with furniture in it. The next day Ms. Urso called Coleman and asked him to start early because of the accident. Coleman started as a driver on September 2.

Additional evidence before the circuit court should also have been considered. The circuit court struck several sentences in the affidavits of the plaintiff, Ms. Sabo, Ms. Tario, and Coleman for failure to comply with Rule 191 (73 Ill. 2d R. 191). But the court's action was too broad. It swept up the good with the bad. The court was correct to strike those portions of the affidavits which were mere conclusions instead of facts admissible in evidence. (*Wanous v.*

*Balaco* (1952), 412 Ill. 545, 547.) But only the tainted portions of the affidavits had to be struck. Where a phrase or clause was conclusional it had to be excised, but the remaining portions of the affidavits could be, and should have been, saved.

For example, when Ms. Tario swore in her affidavit that she saw Clancey driving the bus at 3:30 p.m. on the day of the accident *on his job as a bus driver for Ms. Urso,* only the italicized portion of the statement had to be struck as a conclusion or an unfounded opinion. But the affiant was competent to testify to those things that she personally saw. Her statements of personal observation should not have been stricken. Likewise, statements by Clancey or Ms. Urso that an affiant repeated were inadmissible as hearsay and correctly stricken, but personal observations of the declarants apart from the words spoken could be and should have been considered.

The following portions of the affidavits should thus also have been considered on the motions for summary judgment.

Sue Tario saw Clancey driving the bus on September 1 at about 3:30 p.m. Ms. Tario saw Clancey and Thomas Coleman together at the scene of the accident early on September 2. Clancey tried to give his keys to Coleman.

Thomas Coleman had seen Clancey twice use the bus to drive to the theatre with friends. Coleman saw Clancey driving the bus on Clancey's route on September 1 at about 3:30 p.m. and again at 5:30 p.m. Coleman saw Clancey driving the bus with furniture in it again at 10 p.m. After the accident Clancey talked with Coleman. Once Coleman started working for the school as Clancey's replacement, he parked the bus he was driving wherever he pleased, kept the keys in his posession, and used it for personal reasons, including trips to the theatre and grocery store.

The evidence before the circuit court justified only a partial summary judgment. Under section 57 of the Civil

Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 57), summary judgment will be granted only if the pleadings, affidavits and depositions on file reveal that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. (*Schedler v. Rowley Interstate Transportation Co.* (1977), 68 Ill. 2d 7, 13; *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380.) The affidavits and depositions are to be construed against the moving party. Because summary judgment is such a drastic method of disposing of a case, it should not be employed unless the right of the moving party is free from doubt. See *Dakovitz v. Arrow Road Construction Co.* (1975), 26 Ill. App. 3d 56, 61.

Count I alleged the negligence of an agent, and the only real issue under that count so far as the liability of Urso and the schools is concerned was whether Clancey was acting within the scope of his employment at the time of the accident. The defendants presented evidence through Ms. Urso's affidavit and deposition and through Ms. Chandler's deposition that the scope of the drivers' employment extended only to driving the children to and from the schools. Ms. Sabo's deposition contradicted that assertion in part, Sabo claiming that she had at times run errands for Urso. But there was no contradiction of Urso's affidavits that the bus drivers' duties did not extend to helping friends move furniture. Thus, even if Clancey had not been fired, as Ms. Murphy contends, moving her furniture would not have been within the scope of his employment. While there were conflicts on the question of whether the drivers had received permission to use the buses for personal reasons and the precise time when Clancey was fired, conflicts on which the appellate court relied to deny summary judgment on count I, there was no disagreement on the scope of Clancey's employment and that it did not include the assistance he rendered to Ms. Murphy. Accordingly the evidence that in driving the bus at the time of the accident Clancey was

not acting as an agent of Urso or the schools so as to make them liable was uncontradicted. Because there was no genuine issue of material fact to be tried on count I, summary judgment was proper, and the appellate court erred in remanding this count for trial.

Count II alleged wilful and wanton or negligent entrustment; we agree with the appellate court's determination that summary judgment on this count was not proper. This cause of action required at least that the plaintiff show that the vehicle was entrusted with the owner's approval. Neither party showed a case free from doubt because neither resolved the problem of permission to use the bus for personal reasons. Ms. Urso claimed that Clancey had stolen the vehicle, that he had been fired before the accident. Ms. Chandler agreed that Clancey had been fired, but the two could not settle, in their depositions and affidavit, on a common date or reason for the firing. In addition, there was evidence that the September 1 evening run went smoothly, without the disruption likely to occur if one of the three drivers employed by the schools had been missing. Thus, there appears to be a conflict over whether Clancey had been fired.

There was also conflict over whether, if Clancey had not been fired, he had permission to use the bus. Customary personal use of the buses was adamantly denied by Ms. Urso and Ms. Chandler but asserted by Ms. Sabo, Ms. Tario, and Coleman. Ms. Murphy and Ms. Sabo said they were told by Clancey that he had Ms. Urso's approval to use the bus, but the statements are of dubious admissibility. Nevertheless, Ms. Sabo also participated in the moving, using the school bus which she drove. She testified that Ms. Urso and Ms. Chandler knew about the personal use of the buses by the drivers and sanctioned it because they never stopped this use. On this record, it is impossible to say that the bus either was or was not entrusted to Clancey with Ms. Urso's approval without resolving the witnesses' credibility.

Issues of triable fact remain only on count II. On that count the cause must be remanded to the circuit court for further proceedings. On count I, however, partial summary judgment should have been granted.

CONCLUSION

In cause No. 53425, the judgments of the circuit and appellate courts are reversed and the cause is remanded to the circuit court for further proceedings. In cause No. 53547, the judgment of the circuit court is affirmed as to count I but reversed as to count II. The judgment of the appellate court is reversed on count I but affirmed on count II. The cause is remanded to the circuit court for further proceedings on count II.

53425 — *Reversed and remanded.*
53547 — *Appellate court affirmed*
*in part and reversed in part;*
*circuit court affirmed in*
*part and reversed in part;*
*cause remanded.*

JUSTICE MORAN, dissenting:

I agree with the majority's conclusion that the insurer's interests conflicted with that of Clancey, initially preventing the insurer from defending Clancey in the personal injury action. I believe, however, that the insurer should have sought a declaratory judgment to resolve the conflict and to determine its obligations under the policy.

In *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, this court examined the propriety of seeking a declaratory judgment to determine coverage and, consequently, the duty to defend under two policies of insurance. The policies specifically excluded coverage for injuries intentionally inflicted. The underlying personal injury action brought by the plaintiff Mims against the defendant Peppers resulted from a shooting which took place when Mims

apparently attempted to break into a Pizza Hut restaurant owned by Peppers. The trial court, in the declaratory judgment action, found that Peppers had intentionally caused injury to Mims and that, therefore, no coverage was available under the insurance policies. This court reversed the trial court's finding of intentional injury in the declaratory judgment action, holding that it was an abuse of discretion and that such action was "premature." This court also found that the declaratory judgment action was improper because "[t]his issue was one of the ultimate facts upon which recovery is predicated in the Mims personal injury action against Peppers." *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 197.

Similarly in *Thornton v. Paul* (1978), 74 Ill. 2d 132, the question of the insurer's obligation to defend the insured, as well as coverage under the policy of insurance, turned upon the classification of the insured's action as a "battery" or as an intentional act. (See *Thornton v. Illinois Founders Insurance Co.* (1981), 84 Ill. 2d 365.) The policy covered only acts unintended by the insured and specifically excluded coverage for personal injury "arising out of assualt or battery." In determining whether the insurer must seek a declaratory judgment as to its obligations, this court followed *Peppers* and found that such an action would be premature.

> "[I]f a court were to determine in a declaratory judgment action that the insured's conduct did not come within the coverage of the policy because it constituted a battery, this declaration would be binding on the insured in the personal injury action between the injured party and the insured, and would in all probability be determinative of the issue of liability in that suit." *Thornton v. Paul* (1978), 74 Ill. 2d 132, 157.

Consequently, the court held that the insurer was not obligated to seek a declaratory judgment as to its obligations under the policy and, further, that the insurer's refusal

to defend the insured in the personal injury action did not estop it from asserting defenses of noncoverage in the garnishment proceedings.

The majority erroneously applies the above reasoning as to the appropriateness of a declaratory judgment action to the present circumstances. Unlike *Peppers* and *Thornton,* the question determinative of coverage under the policies here is not the ultimate issue of fact in the underlying personal injury suit brought by Murphy. The majority correctly sets out the general rule: "Where the issues in an underlying suit and a declaratory judgment action are separable, deciding the question of coverage in a collateral proceeding prejudices no party." (88 Ill. 2d at 455.) In the present case, a declaratory judgment action to determine coverage under the policies of insurance would have focused solely on the issue of agency—that is, whether Clancey drove the van with the permission of the owners. This issue is separable from the ultimate issue of the underlying personal injury suit, the negligence of Clancey. The resolution of the agency issue would not in any way prejudice Clancey or Murphy in regard to the issue of Clancey's negligence in driving the van. Moreover, once the agency issue is determined, the insurer's previous alleged conflict of interest with Clancey no longer exists. If coverage under the policy is found to exist, the insurer may then defend Clancey on the issue of his negligence. The interest of both the insurer and Clancey would be the same—to find Clancey not guilty of negligence so as to avoid all liability.

I believe that the insurer's failure in the present case to seek a determination of its obligations under its policy in a declaratory judgment action should estop it from denying that Clancey was covered by the policy in the garnishment proceeding. This court's expansion of the *Thornton* rule allowing an insurer to escape its obligations to defend under a policy of insurance creates a dangerous precedent seriously diluting the contractual obligation of an insurer to

defend an insured under an express promise to do so.

CHIEF JUSTICE GOLDENHERSH joins in this dissent.