475 A.2d 509

**FIREMAN'S FUND INSURANCE COMPANY**

v.

**Magel H. RAIRIGH, et al.**

**No. 917, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

June 6, 1984.

---

John Henry Lewin, Jr., and Benson Everett Legg, Baltimore, with whom were Venable, Baetjer & Howard, Baltimore, on the brief, for appellant.

Patrick A. O'Doherty and Susan S. Miller, Baltimore, with whom were O'Doherty, Gallagher & Nead, Miller & Miller, P.A., Richard C. Whiteford, Whiteford, Taylor, Preston, Trimble & Johnston, Kenneth J. MacFadyen and Friedman,

Glorioso, Cohen & MacFadyen, P.A., Baltimore, on the brief, for appellees.

Argued before LOWE, BISHOP and GETTY, JJ.

GETTY, Judge.

This is an appeal by Fireman's Fund Insurance Company from the granting of a partial summary judgment in the amount of $1,000,000.00 and a jury verdict for $204,200.00 arising from appellant's alleged "bad faith" in refusing to provide a defense to its insured under the terms of an excess policy of insurance issued by appellant. A cross-appeal filed by the appellees alleges error by the trial court in granting appellant's motion for directed verdict on the issues of fraud and punitive damages.

## FACTS

On March 30, 1978, six men—Robert Altimus, Wayne Rairigh, Jack Rockman, Robert Lynn Walker, William Matthews and Donald Erlbeck—flew to Nassau for a short vacation. Rockman elected to extend his visit and was not aboard on April 3rd when the plane crashed in shallow water shortly after flying over the hotel where the group had spent their weekend. All five of the passengers perished in the crash.

The plane in which the five men were flying was a twin engine Aero Commander owned by Phoenix Aviation, Inc. The stockholders of Phoenix were Rockman, Walker, Erlbeck and Michael T. Volatile. Volatile was scheduled to make the flight to Nassau, but canceled for business reasons and Matthews agreed to go in his place. Phoenix had no assets other than the plane and had no employees. The stockholders each paid $50.00 a month to cover basic overhead costs and, additionally, they paid $40.00 per hour for the use of the plane for pleasure and charged $90.00 per hour when the plane was rented by others.

Walker, Erlbeck, Rairigh and Matthews were pilots. Of the four, Matthews had an instrument rating, Walker and

Erlbeck were qualified to fly the plane under visual rules, and Rairigh was certified to fly single engine aircraft. The plane had dual controls and Matthews was found in the left front seat and Erlbeck in the right front seat when the plane was retrieved from the water. Autopsies were performed on each of the five men and blood alcohol tests were conducted regarding the three pilots. Walker and Matthews were determined to have been under the influence of alcohol to some degree. The flight plan maintained at the airport listed Erlbeck as the pilot. Whether Erlbeck or Matthews was actually in control of the plane at the time of the crash is undetermined.

The tragic events of April 3, 1978, spawned a number of lawsuits. Counsel has referred to the litigation as "Phase I" and "Phase II," and we shall do likewise.

*Phase I:* In October, 1978, the Rairigh plaintiffs filed a claim against the Erlbeck estate in the Orphan's Court for Baltimore County alleging that Erlbeck was piloting the plane at the time of the crash. On October 2, 1978, the Altimus plaintiffs sued the Erlbeck estate in the Circuit Court for Baltimore County alleging negligence on the part of Erlbeck in piloting the plane, and negligent entrustment by Erlbeck in permitting Matthews, who was intoxicated, to operate the plane. On October 25, 1978, the Walker plaintiffs filed suit in the Circuit Court for Baltimore County against the estates of Erlbeck and Matthews making allegations similar to those made by the Altimus plaintiffs. Eventually, the Phase I litigation grew to six lawsuits. By amendment in November, 1979, the various plaintiffs added an allegation that the plane was "chartered with crew," the crew being Matthews.

## INSURANCE

Phoenix Aviation was insured by Southeastern Aviation Underwriters, Inc. (SEAU) under a policy which covered this accident, thus requiring it to defend. The policy limits were $500,000.00 designated as $100,000.00 per seat.

SEAU appointed the law firm of Shaw, Pittman, Potts and Trowbridge to represent the Erlbeck estate and Semmes, Bowen and Semmes was appointed by SEAU to represent the Matthews estate. Smith, Somerville and Case represented the personal interests of the Erlbeck estate.

In 1975 Erlbeck purchased an excess liability policy from Fireman's Fund with limits of $1,000,000.00. On the application he listed as underlying insurance his automobile and his home owner's policies. It is the application of the proceeds of Erlbeck's personal excess insurance policy to the plane crash that forms the basis for the Phase II litigation.

SEAU settled the Phase I claims prior to trial by paying $100,000.00 to each of the five estates. As part of that settlement the three plaintiffs (Altimus, Walker and Rairigh) obtained consent judgments totaling $1,500,000.00 against the estates of Erlbeck and Matthews, together with an assignment of any tort or contract rights that the estates had against the excess insurer, Fireman's Fund. In exchange, the plaintiffs agreed not to attempt to collect the consent judgments from the estates. The agreement also provided that the allegations that Erlbeck was piloting the plane were to be deleted from the plaintiffs' suits.

On June 16, 1980, the settlement agreement was signed and Phillip Bostwick, counsel for the Erlbeck estate, advised Fireman's Fund that the judgments would be entered in the Circuit Court for Baltimore County[1] on June 20, unless Fireman's entered an appearance on behalf of the defendants prior thereto in the event that Fireman's Fund disagreed with the settlements. Fireman's Fund did not participate in the settlement agreement involving the SEAU policy. The reasons expressed included the fact that the Erlbeck estate was already represented by competent counsel; that Erlbeck's estate did not ask for a defense; that

---

1. The Altimus and Walker suits were scheduled to begin in the Circuit . Court for Baltimore County on June 16, 1980.

Fireman's Fund would preclude the Erlbeck estate from receiving the $100,000.00 by denying coverage; that Fireman's Fund was not required to defend under the terms of its policy; and that the Erlbeck estate suffered no loss.

The consent judgments were entered in the Rairigh, Walker and Altimus cases on June 20, 1980. By the terms of the SEAU policy, it was not obligated to provide any defense after the limits of the policy had been exhausted by payment of judgment or settlement.

*Phase II:* The second phase of the case unfolded in December, 1980, involving the plaintiffs' suits against Fireman's Fund in the Circuit Court for Baltimore City. It is from the judgments rendered in that trial that the present appeal by Fireman's Fund, and the cross-appeal by the plaintiffs, arises.

The trial court granted the plaintiffs' motion for partial summary judgment in the amount of $1,000,000.00, that amount being the limits of the Fireman's Fund policy. The court decided that by the terms of its policy Fireman's Fund was required to provide a defense to the Erlbeck estate irrespective of the representation provided by SEAU; that Fireman's breached the terms of the policy by refusing to defend after SEAU terminated its representation on June 16, 1980; and that by reason of the breach, Fireman's was estopped to litigate the coverage issue.

A four week trial ensued relating to Fireman's alleged "bad faith" in refusing to defend its insured. The jury awarded the plaintiffs the sum of $204,200.00, representing the unsatisfied portion of the consent judgments.[2] The combined judgment entered by the court, including interest, amounted to $1,452,747.90. A directed verdict was entered for Fireman's on the claims for punitive damages with respect to all counts and upon the fraud, deceit and negli-

---

**2.** Consent judgments –$1,500,000.00; SEAU paid plaintiffs $300,-000.00; summary judgment granted for $1,000,000.00; $200,000.00 unpaid plus $4,200.00 paid for personal defense of the estate.

gent misrepresentation counts. Fireman's Fund appealed and the plaintiffs filed cross-appeals.

The appeals raise the following issues:

*Fireman's Fund:*

1. Did the court err in ruling that Fireman's was estopped to deny coverage of the consent judgments?

2. Did the court err in ruling that Fireman's had breached the terms of its policy by failing to provide a concurrent defense to the Erlbeck estate?

3. Did the court err in ruling that Erlbeck's estate suffered damages on account of Fireman's "bad faith" failure to defend it? [3]

*Plaintiffs:*

1. Was the evidence of fraud in the inducement of the insurance contract, or negligent misrepresentation, sufficient to submit the issue to the jury?

2. If the answer to issue one is in the affirmative, was there sufficient evidence of implied malice to submit to the jury the issue of punitive damages?

3. Was there sufficient evidence of fraud by Fireman's to submit the issue to the jury?

4. If the answer to issue three is in the affirmative, was there sufficient evidence of actual or implied malice to submit to the jury the issue of punitive damages?

5. Was there sufficient evidence of implied malice by Fireman's to submit to the jury the issue of punitive damages based upon bad faith?

6. Did the court err in excluding certain documents from admission into evidence?

Fireman's Fund challenges the trial court's granting summary judgment which precluded it from litigating the coverage issue. The trial that followed the entry of partial

---

**3.** Fireman's fourth issue, denial of a fair trial by erroneous evidentiary rulings, was not argued on appeal. We shall not address the contentions therein.

summary judgment did not involve the coverage issue, because the court instructed the jury that whether the plane was chartered with crew or whether Erlbeck was the pilot or co-pilot "are matters which the Court has ruled as a matter of law are not to be proven in this case." The trial, therefore, was confined to the issue of Fireman's bad faith in not defending the Erlbeck estate.

### Md. Rule 610

We hold that the trial court was in error in precluding Fireman's Fund from raising the coverage issue in the Phase II litigation. We shall, therefore, reverse and remand for a new trial. The trial court granted summary judgment for the $1,000,000.00 limits of the Fireman's Fund policy based upon the court's determination that Fireman's Fund was required to provide a defense to the Erlbeck estate as of the date of the settlement on June 16, 1980. The sanction for refusal to defend, the court decided, is barring the insurer from litigating the coverage issue in a subsequent proceeding seeking to collect the amount of the consent judgments from the excess insurer.

Summary judgment cannot be granted if there is a genuine dispute as to any material fact. *Lawless v. Merrick*, 227 Md. 65, 175 A.2d 27 (1961). If the facts are susceptible of more than one inference, the materiality of that arguable factual dispute must be judged by looking to the inferences drawn in a light most favorable to the person against whom the motion is made and light least favorable to the movant. *Brewer v. Mele*, 267 Md. 437, 298 A.2d 156 (1972); *Berg v. Merricks*, 20 Md.App. 666, 318 A.2d 220 (1974). We believe that the issue of whether the Erlbeck estate sought a defense from Fireman's Fund, considered in the context of the inferences most favorable to Fireman's Fund, presented a genuine dispute as to a material fact that precluded the entry of summary judgment under Md.Rule 610.

On August 7, 1978, Phillip D. Bostwick, a member of the law firm appointed by SEAU to represent the Erlbeck estate, tendered claims control of the three plaintiffs' suits to Fireman's Fund, suggesting that if the tender was refused that Fireman's Fund participate in further settlement negotiations and contribute to the $100,000.00 tendered to, and rejected by, the plaintiffs. Fireman's Fund refused. After the settlement agreement was finalized, whereby the Erlbeck estate received $100,000.00 from SEAU, plus an agreement that the consent judgments entered for the three plaintiffs were collectible only from the excess insurer, a second tender was made.

The second request to defend came in a letter dated June 16, 1980, from Phillip D. Bostwick. After setting forth the pertinent terms of the consent judgments to be entered for the three plaintiffs, the letter concluded:

"A jury was selected in the Altimus and Walker cases in the Circuit Court of Baltimore County on June 16, 1980, for the trial of those cases. We have obtained a brief postponement of that jury trial from Judge Brizendine to afford Fireman's Fund an opportunity to have counsel of their choosing enter an appearance on behalf of the Erlbeck and Matthews Estates and all other persons who may be insureds under the above numbered Fireman's Fund insurance policies to settle these cases or to assume the defense of all said Defendants in the event Fireman's Fund disagrees with the above settlement agreement. Judge Brizendine will reconvene this jury at 10:00 a.m. on Friday, June 20, 1980. If Fireman's Fund has not entered an appearance in these cases on behalf of said Defendant by 9:30 a.m. on that date, the above-mentioned consent judgments will be entered at 10:00 a.m."

The tender amounted to an ultimatum—settle the cases or assume the defense if you disagree with the settlement. Fireman's Fund did neither. Understandably, SEAU wished to avoid the considerable expense in defending the suits, which it was required to defend absent a settlement. Intervention by Fireman's Fund in the four days before

trial would have scuttled the settlement, because it was in the interests of the excess insurer to establish that the plane was not chartered with crew and, in any event, that Earlbeck was part of the "crew," which would, if proved, establish non-coverage.

King Hill, an attorney representing the personal interests of the Erlbeck estate, testified:

"I didn't want anything to upset the settlement that we had reached after we had reached it, after a long period of time, and all the efforts that were made at that time. I never gave any thought of any remote possibility of Fireman's Fund to come in and do anything at that time."

Charles Iliff, appointed by SEAU to represent the Matthews estate, responding to questions involving Fireman's Fund, testified, "I didn't want them to come in, no."

Considered in the light most favorable to Fireman's Fund, *Lawless, supra,* the evidence established that, absent any participation by Fireman's Fund, the Erlbeck estate was to be paid $100,000.00 by SEAU; that the assets of the estate were protected against all claims by the other plaintiffs by assignment of Erlbeck's rights against the excess insurer, Fireman's Fund; that personal counsel for the Erlbeck estate did not want anything to upset the settlement; that no tender of the defense was made until four days prior to trial of the Altimus and Walker suits in the Circuit Court for Baltimore County; and that the eleventh hour tender was an attempt by SEAU to avoid the costs of trial rather than obtain a defense of the Erlbeck estate. In our judgment the facts generated a genuine factual dispute as to whether a defense was sought by the Erlbeck estate from Fireman's Fund. Accordingly, the issue was one for the jury.

### *Estoppel*

■ The underlying purpose of the doctrine of estoppel is to obviate the delay and expense of two trials upon the same issue, one by the injured party against the insured

and the other by either the injured party or the insured against the insurer. This is possible because it is assumed that the interests of the parties to the insurance contract in opposing the injured person's claim are identical. *Farm Bureau Mut. Automobile Ins. Co. v. Hammer*, 177 F.2d 793 (4th Cir.1949), *cert. denied*, 339 U.S. 914, 70 S:Ct. 575, 94 L.Ed. 1339 (1950).

On the other hand, there is the policy of due process which requires that a party have his "day in court." In *Glens Falls Insurance Co. v. American Oil Co.*, 254 Md. 120, 254 A.2d 658 (1969), Judge Barnes opined that this latter policy "recognizes a fundamental right which may override any consideration of efficiency or expediency served by the minimization of litigation."

Assuming, without deciding, for the purposes of this case, that Fireman's Fund had a duty to defend the Erlbeck estate, was the trial court correct in precluding Fireman's Fund from asserting a defense of non-coverage in the Phase II litigation? We think not. Despite the competing judicial philosophies which produce opposite results on this question, we believe that the Court of Appeals has rejected the line of cases followed by the trial court herein.

The plaintiffs cite *Elas v. State Farm Mutual Automobile Ins. Co.*, 39 Ill.App.3d 944, 352 N.E.2d 60 (1976). In *Elas*, the insureds were sued in negligence for damages. State Farm, the excess insurer, denied coverage and refused to defend. The primary carrier defended and paid its policy limits. The plaintiff agreed to hold the settling parties harmless and was assigned all the insureds' rights against the excess carrier. The Illinois Court held that State Farm breached its concurrent duty to defend and was barred from raising exclusionary defenses where it had refused a tender of the defense after the primary carrier had paid its policy limits. *Accord USF & G Co. v. Copfer*, 63 A.D.2d 847, 406 N.Y.S.2d 201 (1978); *Firestine v. Poverman*, 388 F.Supp. 948 (Conn.1975); *Clemmons v. Travelers*

*Ins. Co.*, 88 Ill.App.3d 201, 43 Ill.Dec. 445, 410 N.E.2d 445 (1980).

The rule followed in Illinois, however, does not apply where a conflict of interest arises between insured and insurer. In *Clemmons, supra,* cited by plaintiffs, the Court refers to a case factually similar to *Clemmons* decided during the same term of Court. That case, *Murphy v. Urso,* 88 Ill.2d 444, 58 Ill.Dec. 828, 430 N.E.2d 1079 (1981), addressed an exception to the general rule that where there is a conflict of interest between the insurer and the putative insured, the insurer may decline to take over the insured's defense itself and may do so without making a reservation of rights or seeking a declaratory judgment on coverage, but the insurer remains liable for the costs of the putative insured's defense. The Court of Appeals has adopted a similar rule relating to payment of costs of the insured's defense where the insurer refused to defend due to a conflict of interest. *See Brohawn v. Transamerica Insurance Co.,* 276 Md. 396, 347 A.2d 842 (1975).

The so called "Illinois Rule" has been criticized by several text writers. J. Appleman, *Insurance Law and Practice,* Sec. 4689, commenting on the Illinois cases, states:

"The result would seem to be erroneous. Where there is no coverage, the greatest injury that the insured could have suffered by a failure to defend is the cost of defense—the judgment would have been his responsibility regardless. The Court apparently relies on estoppel and on the breach of contract. Since the insured was in no way misled there could be no estoppel. A breach of contract of course waives a forfeiture, but it does not nor should it create a new contract."

A.D. Windt, *Insurance Claims and Disputes,* Sec. 4.35 (1982), states:

"The vast majority of cases have properly held that an insurer's unjustified refusal to defend does not estop it from later denying coverage under its duty to indemnify. If an insurer wrongfully refused to defend an insured, it

should be liable for the damages that the insured thereby incurs.... The insurer's breach of contract should not, however, be used as a method of obtaining coverage for the insured that the insured did not purchase."

*Accord* 14 G.J. Couch, *Cyclopedia of Insurance Law,* Sec. 51:73 (2d ed. 1982), stating,

"If the insurer does not defend an action against the insured because the claimant's verdict will not resolve a coverage problem in the insured's favor or because the insurer cannot defend with complete fidelity to the insured's sole interest, the insurer is not estopped from thereafter disputing coverage because it refused to defend; rather, the insurer may be heard upon the coverage issue in a proceeding by the insured upon the policy."

In *Glens Falls, supra,* the Court of Appeals considered for the first time whether an insurer, who was not a party and did not defend, may raise a defense of non-coverage subsequent to the granting of a judgment against the insured.

Glens Falls conducted an investigation into an automobile accident and determined that the insured intentionally crashed into a service station in an attempt to injure his wife. Glens Falls refused to defend the insured driver. American Oil Company obtained a judgment against the driver based on negligence and later sued Glens Falls for payment of the judgment. The Court of Appeals (Barnes, J.) rejected the line of cases which hold that an insurer is collaterally estopped by the prior judgment from raising the issue of coverage in a later proceeding seeking satisfaction of the judgment from the insurer.

The Court quoted extensively from Judge Soper's opinion in *Hammer, supra,* holding that the insurer is not estopped by the prior judgment. The reasoning of the Court in *Hammer,* the Court of Appeals stated, "appeals to us as expressing the better and wiser policy for adoption by us." In *Hammer,* Farm Bureau did not defend the insured and after judgments were entered on behalf of several claimants Farm Bureau filed a declaratory judgment action alleg-

ing that the injuries resulted from intentional acts of the insured in crowding the claimant's car off the road and not by accident as alleged in the prior suit.[4]

The Fourth Circuit, in *Hammer*, determined that Farm Bureau was not estopped to litigate the coverage issue, stating:

"It is obvious, however, that the binding effect of a judgment against the insured does not extend to matters outside the scope of the insurance contract, and that the Insurance Company is neither obligated to defend nor bound by the findings of the Court if the claim against the insured is not covered by the policy. To hold otherwise would be to estop the Insurance Company by the acts of the parties in a transaction in which it has no concern and over which it has no control, and to deprive it of its day in court to show that the transaction is foreign to the contract of insurance."

After pointing out that the Court's position was in accord with "Restatement," *Judgments,* Sec. 107(a), Judge Soper added:

"It is obvious that the Insurance Company was not qualified to undertake the defense of the insured in the suits by the injured parties against him, and that this disqualification was due to the insured's own conduct. It was not possible for the Company in these suits to defend the insured, and at the same time to protect its own interests. It could not exculpate itself by showing that the injurious acts of the insured were beyond the scope of the policy, for this showing would establish the liability of the insured to the injured parties to an even greater extent than that claimed in the complaints."

A similar situation is presented in the case *sub judice.* It would have been in the interests of the Erlbeck estate to show that the plane was "chartered with crew" so that any

---

**4.** The insured, Wagner, was convicted of second degree murder for intentionally causing the death of one of the passengers in claimant's car.

judgments entered would be covered by the policy. Conversely, Fireman's Fund would attempt to prove that Erlbeck was flying the plane or that he was piloting it jointly with Matthews and, in either event, no crew chartering was ever contemplated.

The plaintiffs herein seek to distinguish the holding in the *Glens Falls* case by suggesting that the holding is a narrow one limited to its facts and that the intentional versus negligent act is a critical distinction. We are not persuaded by this attempt to restrict the holding in *Glens Falls*. We discern no statement in *Glens Falls* suggesting that the holding is restricted to the particular facts of that case. The issue decided therein, furthermore, is the application of the doctrine of estoppel to a non-defending insurer; this is the precise question raised by the present appeal.

■ We agree that if coverage is established, *i.e.*, the plane was "chartered with crew," and Erlbeck was not part of the crew, that Fireman's Fund is bound by the judgments entered in the Phase I litigation. We hold, however, that Fireman's Fund is entitled to its day in court to determine that issue. The plaintiffs assert that Fireman's Fund could have avoided the present dilemma by defending under a reservation of rights or by seeking a declaratory judgment on the issue of coverage. As *Glens Falls* points out, however, these options are permissive, not mandatory, and the plaintiffs had the same opportunity to seek a declaratory judgment. No estoppel, therefore, may be invoked against the insurer for failing to litigate the coverage issue on these grounds.

■ The plaintiffs also contend, in a further effort to distinguish the holding in *Glens Falls*, that estoppel does not apply if the refusal to defend is a breach of the insurer's duty. We disagree. The general rule is that the insurer is obligated to defend whenever the complaint alleges a basis of liability within the covenant to pay. *Burd v. Sussex Mutual Insurance Co.*, 56 N.J. 383, 267 A.2d 7 (1970). When coverage depends upon a factual issue which

will not be resolved by the trial of the third party's suit against the insured (plaintiffs v. Erlbeck herein), the duty to defend may depend upon the actual facts and not upon the allegations in the suit. *Burd, supra.*

The exclusion in the Fireman's Fund policy stated:

EXCLUSIONS: This insurance does not apply:

.      .      .      .      .

e.   to the ownership, maintenance, operation, use, loading or unloading of any aircraft other than aircraft chartered with crew by or on behalf of the insured or recreational motor vehicle.   Unless coverage is afforded with respect thereto by underlying insurance and then only to the extent of the coverage so afforded.

Thus, the coverage issue does not depend upon an issue material to the litigation between the plaintiffs and Erlbeck. A verdict that the plane was "chartered with crew" would not determine whether Erlbeck was engaged in the *operation* of the plane at the time of the crash, notwithstanding that the settlement agreement deleted any reference to him being the pilot.   The declarations in the Phase I suits as ultimately amended alleged that Erlbeck failed to control his agent, Matthews;  and that Erlbeck knowingly and intentionally permitted, encouraged and directed Matthews to fly the plane.   A general verdict based on these allegations would not determine the coverage issue.

The plaintiffs' contentions would lead to an incongruous result.   An insurer who undertakes to defend is estopped to deny coverage.   This being so, it would be arbitrary to say that an insurer who declines to incur an estoppel by defending is equally barred from a hearing as to coverage because of a finding made in a suit it could not safely defend. Elementary fairness demands a proceeding in which the differences between the insurer and insured may be tried. *Williams v. Bituminous Casualty Corp.,* 51 N.J. 146, 238

A.2d 177 (1968).[5] *Accord: Farmers Ins. Co. of Arizona v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703 (1983); *Snodgrass v. Baize*, 405 N.E.2d 48 (Ind.App.1980).

The Courts, furthermore, have not limited the conflict of interest doctrine, involved herein, to cases of intentional torts. *Kepner v. Western Fire Insurance Co.*, 109 Ariz. 329, 509 P.2d 222 (1973), involved conflict over business pursuits exclusion; *Hargis v. Maryland Am. Gen. Ins. Co.*, 567 S.W.2d 923 (Tex.Civ.App.1978) related to "completed operations hazard"; *Murphy v. Urso*, 88 Ill.2d 444, 58 Ill.Dec. 828, 430 N.E.2d 1079 (1981) concerned whether the insured was a permissive user of the vehicle; and *Associated Indemnity Co. v. Ins. Co. of North America*, 66 Ill. App.3d 807, 25 Ill.Dec. 258, 386 N.E.2d 529 (1979) involved the issue of an insured being an independent contractor.

We perceive a danger in giving preclusive effect to a consent judgment conditioned upon the insured party agreeing to collect it from the insurer alone. Unlike the situation where an actual trial occurs, such agreements leave the parties involved free to stipulate away the right of an absent insurer to raise a legitimate defense to its liability when garnishment is sought after entry of the consent judgment. *See Travelers Indemnity Co. v. State Farm Mutual Ins. Co.*, 330 F.2d 250 (9th Cir.1964); *American Surety Company of New York v. Coblentz*, 381 F.2d 185 (5th Cir.1967).

■ In view of our holding that Fireman's Fund was not estopped from litigating the coverage issue in the Phase II claims, we find it unnecessary to discuss the other issues raised by the claims and cross-claims. We point out, however, that we believe the trial court erred in concluding that the duty to defend is triggered where the claims asserted

---

**5.** *Williams* involved a claim by an injured employee for Workmen's Compensation. The insurer was held not to be estopped from showing that the injury did not occur on a date covered by the policy, despite the employee's claim to the contrary.

exceed the policy limits of the primary insurer. The Fireman's Fund policy states:

Sec. A3. *Defense of Suits Not Covered by Other Insurance.*

"The Company shall defend any suit seeking damages which are not payable on behalf of the insured under the terms of the underlying insurance or any other available valid and collectible insurance but which are payable under the terms of Section A1a. ...."

The trial court interpreted "seeking damages which are not payable" to mean that if the claims exceed the policy limits of the primary insurer's policy, the excess insurer is obligated to defend. If this were true, an excess insurer would be obligated to defend in every case where the claim exceeded the policy limits, regardless of the amount of damages that the claimant could prove. The majority rule is that the excess insurer is not obligated to defend until the primary limits are exhausted. *See* A.D. Windt, *Insurance Claims and Practices*, Sec. 4.11. We interpret Sec. A1a to mean that the policy limits have been paid over, not claimed, before the duty to defend arises.

JUDGMENTS REVERSED. CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL. COSTS TO ABIDE RESULT OF NEW TRIAL.