THIRD DIVISION
June 30, 2008

1-07-1667

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,  ) | |
| CERTAIN LONDON MARKET INSURANCE ) | |
| COMPANIES, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiffs-Appellants, ) | Cook County. |
| ) | |
| v.   ) | |
| ) | |
| THE BOEING COMPANY and ASTRO LIMITED, ) | Honorable |
| ) | Sophia H. Hall, |
| Defendants-Appellees. ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiffs Certain Underwriters at Lloyd's, London, and Certain London Market Insurance

Companies[1] sought a judicial declaration of their obligations under reinsurance and direct insurance

_____

[1] Plaintiffs' original complaint for declaratory judgment and abridged complaint for

declaratory judgment state that the named plaintiffs, certain Underwriters at Lloyd's, London,

and certain insurance companies doing business in the London insurance market are identified

"in Exhibit 1"; however, "Exhibit 1" was not attached to either complaint and was not included

in the record. Further, there is no specific pleading, list, table or schedule provided in the record

that names each of the plaintiffs involved in this case. Accordingly, we are unable to identify and

list specifically all the named plaintiffs in this opinion, as reflected in the caption.

contracts involving defendant Astro Limited (Astro), serving as both the reinsured and direct, captive insurer, and defendant Boeing Company (Boeing), the direct insured. The circuit court of Cook County granted defendants' motion to stay plaintiffs' declaratory judgment action. Plaintiffs filed this interlocutory appeal pursuant to Supreme Court Rule 307(a) (188 Ill. 2d R. 307(a)), arguing that the circuit court abused its discretion by finding that overlapping issues and discovery complications warranted a stay of the declaratory judgment proceedings until the completion of the underlying international arbitration. For the following reasons, we find no abuse of discretion and affirm the judgment of the circuit court.

## I. BACKGROUND

Plaintiffs (sometimes, collectively, Reinsurers) are comprised of a number of insurers that each subscribed to the facultative reinsurance of Astro in regard to its aviation liability policy issued to Boeing for the period from July 1, 1999, to July 1, 2002. Boeing, a Delaware corporation, is a designer and manufacturer of numerous aviation and aerospace products, including satellites and advanced information and communication systems. Astro, Boeing's wholly owned subsidiary, is a limited liability company organized under the laws of, and based in, Bermuda. In this case, plaintiffs sought a declaratory judgment to determine their obligations for liability coverage under both the reinsurance and direct insurance policies concerning the loss of a telecommunications satellite.

Astro directly insured 80% of Boeing's 1999 to 2002 aerospace liability coverage. A second insurance policy issued by New-Jersey-based insurer Global Aerospace, Inc. (formerly Associated Aviation Underwriters (AAU)), provided the remaining 20% coverage of the total limits of liability.[2]

---

[2]On October 5, 2006, the circuit court granted Plaintiffs' motion to voluntarily dismiss

Astro's liability insurance policy covered certain specified risks issued in favor of Boeing and its subsidiaries.

Plaintiffs' reinsurance contract provides 100% coverage of the original insurance limits undertaken by Astro in the aviation liability policy it issued to Boeing. The "Lloyd's Proportional Reinsurance Policy" also contains a "Simultaneous Payments Clause," which provides:

> "In the event of a claim under the original policy [between Astro and Boeing], Reinsurers hereon agree that any settlement or advance of funds by the letter of credit or otherwise shall take place at the same time as on the original in order that the Reinsured shall not be required to advance funds on behalf of the Reinsurer."

In short, the terms of the simultaneous payments clause denote that Astro's own coverage under its reinsurance policy with plaintiffs is coextensive with its coverage obligation to Boeing.

Astro and its leading reinsurer, Kiln Syndicate 510 at Lloyd's of London (Kiln), on behalf of itself and a number of concurrent reinsurers, also entered into a "claims handling agreement" in connection with the liability insurance afforded to Boeing under Astro's policy for the period from July 1, 1999 to July 1, 2002.[3] The claims handling agreement designated Kiln and AAU as joint

Defendants Global Aerospace, Inc., and Global Aerospace Underwriting Managers Limited from the instant case pursuant to section 2-1009 of the Code of Civil Procedure (735 ILCS 5/2-1009 (West 2000)).

[3] The claims handling agreement identifies the concurrent reinsurers as Kiln, London Underwriters at Lloyd's, British Insurance Companies and other foreign insurers. Plaintiffs'

claims leaders, stating that they "shall have sole discretion and exclusive control over the nature and extent of [the preliminary] investigation which they may cause to be conducted, including the selection or designation of investigators, adjusters and attorneys and over the negotiation, adjustment, settlement and/or defense of claims or suits presented [against Boeing]." Pertinent to this case, the claims handling agreement also provides:

> "In the instance of a claim involving a significant conflict of interest on the part of [Kiln], it will act solely in the interest of Boeing and will divest itself of claims control on behalf of its other insureds in any claims involving Boeing."

Turning to the circumstances involving the subject coverage claims, Thuraya Satellite Telecommunications Private Joint Stock Company (Thuraya), a Saudi Arabian company, entered into a September 1997 contract with Hughes Space and Communications International, Inc. (Hughes) to construct a telecommunications satellite known as "Thuraya D1." Boeing acquired the Hughes corporate entity as a subsidiary in 2000 and renamed it Boeing Satellite Systems, Inc. (BSSI).

In October 2000, Thuraya D1 was launched without incident and successfully reached a geosynchronous orbit approximately 93 miles above Saudi Arabia. Following the launch, Boeing continued to monitor the performance of Thuraya D1 by means of telemetry data sent from the satellite to the ground station.

---

reinsurance policy as provided in the record does not include a list, table or schedule naming specific Reinsurers or syndicates that subscribed to the policy and, as a result, it is unclear which plaintiffs are considered "concurrent reinsurers" under the claims handling agreement.

1-07-1667

In September 2001, Boeing allegedly first advised Thuraya of a decrease in Thuraya D1's electrical output. Thuraya initially notified its insurers of the satellite's power anomalies on September 17, 2001.

Boeing continued to monitor Thuraya D1's electrical output through the fall of 2001 and thereafter. On November 30, 2001, Boeing informed Thuraya that no defects had been identified within Thuraya D1, but eventually isolated the power output problem to a degradation of the optical properties of the "solar concentration array" (SCA), a feature on Thuraya D1 used to capture solar radiation and convert it to electricity. By the spring of 2002, projections of Thuraya D1's continual power degradation indicated that the satellite's useful life would be well short of the expected 12 years.

On March 12, 2002, Thuraya asserted a claim against its insurers that, based on alleged defects affecting the SCA and the power projections provided by Boeing, Thuraya D1 was a "constructive total loss" within the meaning of its satellite coverage and total loss policies. An investigation of Thuraya's claim resulted in a purported payment of $196,514,442 by Thuraya's insurers to settle the insurance claim. In April 2003, Thuraya signed a "release and discharge agreement" assigning and subrogating Thuraya's rights under its satellite coverage and total loss policies to certain of its insurers.

On September 10, 2004, certain of Thuraya's insurers (underlying claimants) filed a request for arbitration (Underlying Action) seeking reimbursement from Boeing for the settlement payment made to Thuraya. Pursuant to the contract between Thuraya and Boeing, Underlying Claimants brought the Underlying Action as an arbitration proceeding before the International Chamber of

Commerce in Paris, France.[4] The contract is subject to the civil laws of the emirate of Abu Dhabi, United Arab Emirates (UAE). Underlying Claimants have asserted two general theories of recovery against Boeing: (1) breach of contract and (2) misrepresentation or fraud.

First, Underlying Claimants contend that Thuraya D1 did not meet the performance and functionality requirements pursuant to the contract between Boeing and Thuraya because: (1) the SCA system used on Thuraya D1 and former models within the same 702 series of satellites was defective, leading to a shortage of predicted power output and catastrophic failure of the satellite; and (2) Boeing failed to implement and secure a complete quality assurance program to test, analyze, document, report and remedy any failures concerning Thuraya D1 in accordance with the contract.

Underlying Claimants' second ground of relief involves Galaxy XI, another 702 series satellite manufactured by BSSI's predecessor, Hughes, and launched 10 months prior to Thuraya D1. Galaxy XI was equipped with the same SCA system as Thuraya D1 and purportedly had similar power output problems. Underlying Claimants assert that Boeing sought to minimize or conceal the consequences of the power losses and their impact on the performance of Thuraya D1 until such time that Thuraya issued both a preliminary acceptance agreement and final acceptance agreement for the purchase of Thuraya D1 and additional 702 series satellites. Underlying Claimants allege that, after Thuraya entered into the final acceptance agreement, Boeing abruptly switched to an admission of

[4] Underlying Claimants' demand for arbitration is not part of the record on appeal because it is within the confidentiality protections of the Underlying Action. The appellate record, however, does contain an April 30, 2004, letter from Underlying Claimants' French counsel to Boeing asserting initial claims for the loss of Thuraya D1.

fact that Thuraya D1 was a constructive total loss, and they have since supported Thuraya's claim under Thuraya's insurance policy while also arranging the launch of Thuraya's second satellite and the sale of a third satellite, benefitting substantially from the proceeds of the payments made by Thuraya's insurers. Underlying Claimants contend that Boeing knew about the in-orbit power deviations being experienced by its 702 series satellites both before and after the launch of Thuraya D1. Furthermore, Underlying Claimants allege that Boeing committed "gross error" within the meaning of UAE law, which may negate various limitations of liability in the contract between Thuraya and Boeing.

In addition, Underlying Claimants requested that Boeing preserve certain documentation within its possession that was relevant to their claims. Underlying Claimants provided to Boeing a list of various classes of documentation for potential disclosure, including, inter alia:

"(1) All documents relating to the Contract signed between Thuraya and the company now known as BSSI;

(2) All correspondence entered into and all information exchanged between Thuraya, its agents and consultants and any entities within the Boeing group of companies *** and/or BSSI relating to any of the six BSS 702 satellites, including the Galaxy XI and Thuraya D1Satellites, and relating in particular to the identification and consequences of the anomalies and defects identified by BSSI in connection with the satellites, and to the proposals made by BSSI following its admission that the 702

satellites would not survive their service lives;

(3) All technical documents and information relevant to the BSS 702 series satellites and [SCA] design and satellite power system; and

(4) All relevant documents and information relating to the sale of [Hughes] to [Boeing], including but not limited to *** any correspondences between [Boeing] and [Hughes] with respect to the potential liabilities of the company now known as BSSI, as well as any correspondence between [Boeing] and [Hughes] with respect to the defects now known to exist in the Galaxy XI, Thuraya D1 and other BSS 702 satellites."

Kiln, on behalf of itself and Reinsurers, reserved their rights under both their reinsurance policy and Astro's direct insurance policy shortly before Underlying Claimants' demand for arbitration was issued. Kiln sent a copy of the reservation of rights letter to Boeing "pursuant to the Claims Handling Agreement between Astro and Kiln to the extent that [the reinsurance policy] is applicable to the claims at issue asserted by [Underlying Claimants]." Kiln asserted that there would be no coverage under the reinsurance policy for the liabilities of Hughes prior to Boeing's acquisition. Kiln also stated that Reinsurers agreed to participate in the defense of Boeing with respect to the claims asserted by Underlying Claimants, subject to a reservation of rights.

In addition, Kiln noted the following in its reservation of rights letter:

"As Astro and Boeing are aware, the world aerospace and aerospace

insurance markets are a relatively small community. **As a result, certain Reinsurers also participated in the risk undertaken by [Underlying Claimants].** We wished to bring this fact to your attention solely for information purposes and it has no bearing on the issues raised in this letter.

\* \* \*

**Any duty on the part of Reinsurers to pay indemnity in respect of any sums due to [Underlying Claimants] will depend on the actual facts as determined - not mere allegations in the Demand Letter or any subsequent arbitration demand."** (Emphasis added.)

Kiln also set forth a coverage analysis of Astro's direct insurance policy, asserting the possibility of no coverage and policy exclusions for the allegations contained in Underlying Claimants' demand for arbitration as to six separate coverage sections, including premises liability, products liability, grounding liability, special property damage liability, legal liability for property damage to Jetfoil 929 products and excess legal liabilities. Kiln also stated:

"[T]o the extent that Astro and/or Boeing were aware of the matters set forth in the Demand Letter [for arbitration] prior to the acquisition of Hughes, they might have had an obligation to disclose these circumstances to Reinsurers prior to the inclusion of the former Hughes companies as insureds under the Policy and the reinsurance contracts."

9

Finally, Kiln acknowledged the potential conflict of interest between plaintiffs and Boeing, noting, inter alia, that the reservation of rights "with respect to whether the [underlying] claims are for damage that was 'expected' by Boeing, may lead to a divergence of interest between Boeing and Reinsurers." In regard to the potential conflict with Boeing, Kiln stated:

> "Reinsurers believe that, absent Boeing's express written agreement, Reinsurers should not 'control' the defence [sic] of the [Underlying Action] pursuant to the Claims Handling Agreement with Astro or otherwise. Reinsurers' participation in the defence [sic] for the present time and subject to all the prior reservations will therefore be satisfied by their agreement to fund the defence [sic] of Boeing by independent defence [sic] counsel selected by Boeing.
>
> * * *
>
> Reinsurers expect that Boeing will vigorously defend against a claim by [Underlying Claimants] regarding the matters set forth in the [arbitration] Demand Letter."

Kiln stated that Reinsurers "may wish to consult with Boeing and Astro in matters relating to overall strategy" and requested that independent defense counsel provide them with "copies of all submissions in the arbitration proceedings and similar documents, and to provide regular status reports to Reinsurers."

In the ongoing Underlying Action, the arbitration tribunal rejected Underlying Claimants' requests to take document discovery against Boeing, but did order Underlying Claimants to produce

certain documents. The rules governing international arbitrations do not permit deposition discovery. The arbitration tribunal also held that "all information and documents produced by a party in this arbitration shall be kept confidential by the other parties *** and they shall be used only in connection with this arbitration."

Prior to the arbitration hearing in the Underlying Action, plaintiffs sought certain documentation from Boeing in order to investigate and make a coverage determination for its reinsurance policy with Astro. In a July 26, 2005, letter to Boeing's director of insurance litigation and claims, plaintiffs' counsel requested "certain documents that bear on the underlying claim." Plaintiffs' counsel asserted that Boeing denied plaintiffs access to certain documentation due to restrictions imposed under the International Traffic in Arms Regulations (ITAR). ITAR and the Arms Export Control Act (AECA) (22 U.S.C. § 2778 (1994 & Supp. IV 1998)) govern the disclosure of certain satellite technology to non-United States persons and entities. Plaintiffs' counsel acknowledged that a license or "Technical Assistance Agreement" (TAA) from the United States government was the only means to allow disclosure of ITAR-protected information to companies or individuals who are not United States citizens. Plaintiffs' counsel objected to Boeing's decision to include in its application for a TAA only those plaintiffs that have no involvement in the Underlying Action.

Plaintiffs' counsel requested access to the withheld information and proposed building an "ethical wall" due to plaintiffs' conflict of interest with Boeing:

> "The insurers that undertake aviation and space risks are fairly
> limited, like the companies that seek insurance relating to risks

arising out of the manufacture, launch and operation of aviation and space equipment. *As such, these insurers routinely handle matters in which their insureds have a potential conflict of interest. Consequently, these insurers are adept at establishing procedures to prohibit any dissemination of confidential information that may affect the interests of their insureds. In this instance, Reinsurers immediately advised Astro Limited and Boeing that certain Reinsurers were also insurers of Thuraya, and subsequently subrogated claimants.* Reinsurers advised Boeing that they had put in place internal mechanisms to protect all information provided by Boeing and its defense counsel from being communicated or otherwise shared with any person with responsibilities in handling matters on behalf of the 702 satellite owners." (Emphasis added.)

Plaintiffs' counsel requested all nonprivileged information to investigate coverage issues, including defense counsel's detailed billing invoices from the past, present and future. Plaintiffs' counsel claimed that Boeing was billing for efforts undertaken regarding unrelated litigation involving other 702 series satellites. Plaintiffs' counsel asserted that Boeing's duty to cooperate obligates it to provide the reasonable access requested.

In a September 8, 2005, letter to Boeing, plaintiffs' counsel acknowledged that many of the documents sought by plaintiffs were subject to restrictions imposed under ITAR. Plaintiffs' counsel claimed that Boeing was not justified in taking such a broad view of ITAR and was going beyond

what was required under the law. Plaintiffs' counsel again offered to enter into a confidentiality agreement with Boeing and plaintiffs of United States citizenship "to further demonstrate [plaintiffs'] willingness to maintain the ITAR-protected documents strictly confidential." Consequently, "U.S. Reinsurer representatives and members of our firm can conduct the required investigation into the serious questions concerning coverage raised by the underlying claim." Plaintiffs' counsel noted that by agreeing to enter into the confidentiality agreement, "Boeing will thereby be cooperating with its Reinsurers in a manner that is consistent with the law." In addition, plaintiffs' counsel requested that, if Boeing would not agree to enter into a confidentiality agreement with plaintiffs of United States citizenship, plaintiffs would accept redacted documents instead.

In a January 12, 2006, letter to Boeing, plaintiffs' counsel requested four categories of alleged non-ITAR-controlled information, as follows: (1) "[c]ontracts with amendments for 702 satellites that originally included or contemplated the [SCA] at issue"; (2) "[i]nformation concerning the investment of Boeing and/or BSSI in Thuraya"; (3) "[i]nformation concerning any demands made by Boeing to the former owner of [Hughes] concerning the 702 satellite failures"; and (4) "information about the negotiation and accommodation in sales price of [Hughes]."[5]

On June 8, 2006, plaintiffs filed an abridged complaint for declaratory judgment pursuant to section 2-701 of the Code of Civile Procedure (735 ILCS 5/2-701 (West 2006)), seeking a declaration of their obligations, if any, under the contracts of insurance and reinsurance relating to

---

[5] Plaintiffs acknowledged that Underlying Claimants withdrew their claim arising out of the relationship between Boeing and/or BSSI and Thuraya and, likewise, plaintiffs subsequently withdrew their request for information from Boeing on this subject.

the claims asserted against Boeing. Plaintiffs' declaratory judgment action included claims that Galaxy XI was the first satellite launched to incorporate the SCA system and that Boeing produced four additional 702 series satellites with SCA systems after the launch of Thuraya D1, all of which encountered power generation problems. Plaintiffs' complaint asserted that, "[s]ince November 2004, [plaintiffs] have sought information relevant to their coverage investigation from Boeing" and that, "[t]o date, Boeing has not provided [plaintiffs] with the information necessary to establish coverage under the insurance contracts." Plaintiffs' complaint also stated, "[t]he allegations asserted by UNDERLYING CLAIMANTS against BOEING raise significant issues as to whether this claim is covered under the terms and conditions of the insurance contracts." Further, plaintiffs claimed, "[t]he allegations asserted against Boeing suggest that the claim may fall outside of the coverage provided." Plaintiffs also noted that they "agreed to fund, and have been funding, their share of BOEING's defense in respect of this claim under a full reservation of their rights, until a coverage determination can be made." Finally, plaintiffs claimed, "[a]n actual, ripe and justiciable controversy exists between UNDERWRITERS, ASTRO and BOEING regarding UNDERWRITERS' obligations, if any, under the contracts of insurance and reinsurance."

On December 12, 2006, Boeing moved to stay the declaratory judgment proceedings until: (1) plaintiffs obtain a TAA so that discovery may proceed without violating AECA and ITAR, and (2) the underlying arbitration against Boeing is concluded, "to avoid the risk of prejudice to Boeing's interest" posed by the Underlying Action. Astro did not oppose Boeing's motion to stay proceedings. In its motion, Boeing noted the dual role of certain plaintiffs in this case as reinsurers of Astro and insurers of Thuraya. Boeing argued that the dual role of these certain plaintiffs presents

a conflict of interest because they also are claimants seeking reimbursement from Boeing in the Underlying Action.

Boeing asserted that plaintiffs' coverage defense overlaps with Underlying Claimants' theory of liability and that a finding against Boeing in the declaratory judgment action here would establish a violation in the Underlying Action by the doctrine of collateral estoppel or issue preclusion. In addition, Boeing contended that plaintiffs' use of Illinois discovery tools would undermine the discovery and confidentiality rulings in the Underlying Action. Boeing argued that discovery in this case would allow the dual role plaintiffs to circumvent the international arbitration tribunal's orders restricting the type and timing of discovery and confidentiality of the information disclosed in the arbitration. Boeing contended there is a substantial risk that evidence developed from discovery in the declaratory judgment proceedings may find its way into the hands of the dual role plaintiffs arbitrating against Boeing. According to Boeing, a coverage determination at this point would pose a severe risk of prejudice to its interests in the Underlying Action and, therefore, a stay is warranted until the conclusion of the international arbitration.

In response to Boeing's motion to stay proceedings, plaintiffs argued that their declaratory judgment action presents separate issues from those contested in the Underlying Action. Plaintiffs claimed that "the allegations of [Underlying Claimants in the Underlying Action] taken as true appear to squarely meet the terms of" certain policy exclusions in Astro's insurance contract regarding the failure "to meet the level of performance, quality, fitness or durability warranted" by Boeing. Plaintiffs also noted Astro's direct insurance policy exclusion for "damages claimed for the withdrawal, *** replacement, modification, loss of use or restricted use of *** SPACECRAFT

15

PRODUCTS *** if such products *** are withdrawn from the market or from use *** because of any known or suspected defect or deficiency therein." Plaintiffs further noted that Boeing admitted in its answer that the SCA systems utilized in Galaxy XI, Thuraya D1 and four subsequent 702 series satellites were not used on any subsequent satellite manufactured by Boeing. Plaintiffs stated that they "have no reason to believe that these insurance contract provisions will be addressed in the underlying arbitration."

In addition, plaintiffs responded that they intend to pursue evidence concerning whether Astro "had the duty to disclose information to Plaintiffs and/or Boeing had the duty to disclose information to [Astro] concerning the performance of the Galaxy XI satellite at the time Boeing added the newly acquired [BSSI] to the Astro policy." Plaintiffs further argued that staying discovery in the declaratory judgment proceedings is inefficient and not in the interests of justice.

On July 27, 2007, the circuit court heard oral argument on Boeing's motion to stay proceedings. During oral argument, counsel for Boeing asserted that the discovery rulings in the Underlying Action "severely limited discovery, and even routine discovery here would be something that [Underlying Claimants] in the [Underlying Action] could not get." Boeing also argued that proceeding in the declaratory judgment action would pose a significant danger because of the involvement of dual role plaintiffs in both cases.

Plaintiffs responded that the allegations in the Underlying Action and the declaratory judgment action are different because the Underlying Action corresponds to a breach of contract, whereas the declaratory judgment action involves the determination of coverage for an insurance contract. Plaintiffs contended that the exclusions from Astro's insurance policy have no overlap with

the Underlying Action. Counsel for plaintiffs also stated, however, "[w]e do not dispute that there is also the allegation in the [Underlying Action] about whether Boeing intentionally did -- you know, knew about this information and failed to disclose it to Thuraya." Plaintiffs' counsel stated that, "of course, the intentional conduct, would not be covered under the insurance," but "the primary bases of the reservation of rights and [plaintiffs'] concerns are really about these exclusions." In addition, plaintiffs' counsel stated:

"I think the real issue here, Your Honor, is whether it's appropriate for there to be a motion to stay.

I mean, certainly, we do not disagree. And I think Boeing also set forth in its brief that there are certain facts -- certain facts that would be common to the underlying arbitration and certain facts that the reinsurers would seek to investigate whether coverage is afforded under these agreements.

But they have really different applications to these two contracts, very different applications, and that's what's key."

The court granted Boeing's motion on May 25, 2007, ordering a stay of discovery and the declaratory judgment proceedings until plaintiffs obtain a TAA in compliance with ITAR and the Underlying Action concludes. The court held that overlapping issues and discovery complications justified a stay until the Underlying Action was completed. Plaintiffs timely filed their interlocutory appeal.

## II. ANALYSIS

In this interlocutory appeal, we determine whether the circuit court abused its discretion by ordering a stay of the declaratory judgment proceedings. As will be discussed later in this opinion, we also determine whether plaintiffs' declaratory judgment action is ripe for adjudication and whether a conflict of interest precludes discovery in this case until the conclusion of the Underlying Action.

Plaintiffs argue on appeal that the circuit court abused its discretion by failing to hold Boeing to its burden of proof that a stay was warranted. Plaintiffs assert that, assuming a total overlap of issues exists in this case, the court had no basis on which to grant a stay because Boeing never met its burden of proof by clear and convincing evidence that any overlap would predetermine the outcome of, or have any bearing on, the Underlying Action.

Plaintiffs also assert that Boeing has the burden to prove the rulings in this coverage action would have a collateral estoppel effect on the Underlying Action. Plaintiffs rely upon Murphy v. Urso, 88 Ill. 2d 444 (1981), arguing that, in Illinois, the decisive factor in determining whether a declaratory judgment action should proceed before resolution of the underlying matter is whether any rulings in the declaratory judgment action would have collateral estoppel effect. Plaintiffs contend that Boeing introduced no evidence of the laws of the UAE and, thus, no valid basis exists to assume that collateral estoppel or any similar doctrine applies. Plaintiffs point out that the UAE has a civil law system, which does not follow the doctrine of stare decisis. Plaintiffs argue, therefore, that there is no evidence collateral estoppel or any similar doctrine could serve to potentially prejudice Boeing in the Underlying Action. In addition, plaintiffs contend they

18

constructed ethical walls so that no prejudice would inhere from the fact that certain Plaintiffs are also Underlying Claimants in the Underlying Action.[6]

Boeing responds that a stay is warranted because the declaratory judgment proceedings raise issues substantially similar to those in the Underlying Action, which could prejudice the defense of that action. Boeing argues plaintiffs' assertion that an insured has the burden of proof to establish the elements of collateral estoppel in cases where coverage is determined prior to the underlying action is not supported by Illinois law. Boeing contends that the court properly ordered a stay based on plaintiffs' admission of overlap of issues between the declaratory judgment action and the Underlying Action. Boeing asserts a declaratory judgment action that raises the same issues in an ongoing, unresolved underlying litigation is premature regardless of whether the collateral estoppel doctrine applies.

A. Standard of Review

In an interlocutory appeal from an order granting a motion to stay proceedings, the scope of review is limited to an examination of whether the circuit court abused its discretion in granting the stay. See Estate of Bass v. Katten, 375 Ill. App. 3d 62, 67 (2007). "Under the abuse-of-discretion

---

[6] Plaintiffs also argue in this interlocutory appeal that the circuit court abused its discretion by staying the declaratory judgment proceedings until Plaintiffs obtain a TAA to comply with AECA and ITAR. On January 23, 2008, while this appeal was pending, the United States Department of State approved plaintiffs' application for a TAA. On February 1, 2008, plaintiffs advised this court by motion that its argument on this issue was rendered moot and, therefore, we need not address it here.

standard, a reviewing court does not decide whether it agrees with the circuit court's decision but, rather, determines whether the circuit court ' " 'acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.' " [Citations.]' [Citation.]" Estate of Bass, 375 Ill. App. 3d at 67. On interlocutory appeal, the reviewing court determines " 'whether there was a sufficient showing made to the [circuit] court to sustain its order granting or denying the relief sought.' " Estate of Bass, 375 Ill. App. 3d at 67, quoting Lindsey v. Board of Education of the City of Chicago, 127 Ill. App. 3d 413, 418 (1984). "A reviewing court looks to the sufficiency of the evidence, not to determine controverted rights or to decide the merits of the case, but only for the limited purpose of ascertaining whether the [circuit] court abused its discretion in entering the interlocutory order." Estate of Bass, 375 Ill. App. 3d at 67-68, citing Lindsey, 127 Ill. App. 3d at 418.

B. Order to Stay Declaratory Judgment Proceedings

"A stay order seeks only to preserve the status quo existing on the date of its entry and does not address in any way the merits of the underlying dispute." Kaden v. Pucinski, 263 Ill. App. 3d 611, 615 (1994). "The circuit court may stay proceedings as part of its inherent authority to control the disposition of cases before it." Philips Electronics, N.V. v. New Hampshire Insurance Co., 295 Ill. App. 3d 895, 901 (1998). The moving party must prove by clear and convincing evidence that a stay of the proceedings outweighs the potential harm to the party against whom it is operative. Zurich Insurance Co. v. Raymark Industries, Inc., 213 Ill. App. 3d 591, 595 (1991). Thus, the party seeking the stay must " 'make out a clear case of hardship or inequity in being required to go

forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else.' " Zurich Insurance, 213 Ill. App. 3d at 595, quoting Landis v. North American Co., 299 U.S. 248, 254-55, 81 L. Ed. 153, 158, 57 S. Ct. 163, 165-66 (1936).

### C. Plaintiffs' Role in the Instant Case

In this case, the parties have not indicated whether plaintiffs are to be considered both as reinsurers and insurers in their declaratory judgment action, although plaintiffs request a determination of their obligations under both policies. Illinois courts have not addressed a scenario where the reinsurer pursues a declaratory judgment action to determine obligations on both the reinsurance and direct insurance contracts.

Generally, "an agreement of reinsurance is a promise by one insurance company to reimburse the original insurer should it be compelled to pay under the policy of direct insurance the insured who suffered the original loss." In re Liquidations of Reserve Insurance Co., 122 Ill. 2d 555, 562 (1988). The supreme court has observed that the interest in which the direct insurer has in an insurance contract is separate and distinct from the interest which the reinsurer has in a reinsurance contract. See In re Liquidations of Reserve Insurance, 122 Ill. 2d at 562; People ex rel. Baylor v. Highway Insurance Co., 57 Ill. 2d 590, 594-95 (1974). " ' "The ordinary contract of re-insurance operates solely between the insurer and the re-insurer, and creates no privity whatever between the re-insurer and the person originally insured." ' " People ex rel. Baylor, 57 Ill. 2d at 594, quoting Vial v. Norwich Union Fire Insurance Society, 257 Ill. 355, 358 (1913). The supreme court in People ex rel. Baylor found that, absent special circumstances, a contract of insurance is separate from a contract of reinsurance and that the reinsurer does not have any liability to the person originally

insured. People ex rel. Baylor, 57 Ill. 2d at 595.

The People ex rel. Baylor court, however, noted an exception to the general rule, *i.e.*, "special circumstances," as elucidated in a Missouri Supreme Court case:

> " '[I]n any case where the contract of reinsurance is more than a mere contract of indemnity, and is made for the benefit of the policyholders of the reinsured, and by it the reinsurer assumes the liability of the latter on its policies, the liability of the reinsurer may be directly enforced by the insured, or by his privies.' " First National Bank of Kansas City v. Higgins, 357 S.W.2d 139, 143 (Mo. 1962), quoting G. Couch, Cyclopedia of Insurance Law, §2276 at 7434 (1931).

The Higgins court held that "a reinsurance contract may be drawn in such form and with such provisions so as to create a liability on the part of the reinsurer directly to the original insured," which "must be based on the theory that the original insured is a third party beneficiary of the reinsurance agreement." Higgins, 357 S.W.2d at 143.

In this case, plaintiffs' reinsurance contract follows the exception to the general rule as noted in Higgins. Here, we can surmise from the record that plaintiffs not only owe a duty as reinsurers, but also have assumed the duties of the insurer. First and foremost, plaintiffs' abridged complaint for declaratory judgment requests a coverage determination under both the reinsurance and direct insurance policies. Next, the reinsurance policy at issue includes the simultaneous payments clause, which demonstrates that Astro's coverage under plaintiffs' policy is coextensive with Astro's direct insurance coverage obligations to Boeing. Certain plaintiffs also entered into a claims handling

agreement in connection with the direct liability insurance afforded to Boeing under Astro's policy. Plaintiffs agreed to fund the defense of Boeing in the Underlying Action and stated as such in their abridged complaint for declaratory judgment. Kiln, Astro's leading reinsurer, reserved plaintiffs' right to contest coverage under Astro's direct insurance policy. The record on appeal and the briefs submitted by the parties characterize plaintiffs' role in this litigation as direct insurers without objection, even though Plaintiffs also are reinsurers. Accordingly, we find that special circumstances require our analysis to consider plaintiffs as both reinsurers and direct insurers for the purposes of this interlocutory appeal. See People ex rel. Baylor, 57 Ill. 2d at 595; Higgins, 357 S.W.2d at 142-144. Having determined plaintiffs' simultaneous roles, we will address their duties as reinsurers and insurers separately.

### D.  Plaintiffs' Duty as Reinsurers

Illinois courts have held that "a contract of reinsurance is not one of insurance but simply one of indemnity, and that the contract of insurance and that of reinsurance remain totally distinct and unconnected." In re Liquidations of Reserve Insurance, 122 Ill. 2d at 564. Plaintiffs' reservation of rights letter acknowledged their duty as reinsurers to indemnify, stating "[a]ny duty on the part of Reinsurers to pay indemnity in respect of any sums due to [Underlying Claimants] will depend on the actual facts as determined - not mere allegations in the Demand letter or any subsequent arbitration demand." Accordingly, plaintiffs acknowledge their sole duty as reinsurers in this case is the duty to indemnify.

### E.  Plaintiffs' Duties as Insurers

"Under Illinois law an insured contracts for and has a right to expect two separate and distinct

duties from an insurer: (1) the duty to defend him if a claim is made against him; and (2) the duty to indemnify him if he is found legally liable for the occurrence of a covered risk." Chandler v. Doherty, 299 Ill. App. 3d 797, 801 (1998), citing Conway v. Country Casualty Insurance Co., 92 Ill. 2d 388, 394 (1982). "An insurer's duty to defend *** is broader than its duty to indemnify." Hartford Fire Insurance Co. v. Whitehall Convalescent & Nursing Home, Inc., 321 Ill. App.3d 879, 888, 748 N.E.2d 674 (2001). An insurer may be required to defend its insured even when, ultimately, there may be no obligation to indemnify. Chandler, 299 Ill. App. 3d at 801, citing Zurich Insurance Co. v. Raymark Industries, Inc., 118 Ill. 2d 23, 52 (1987).

Illinois courts consistently have identified two options for an insurer taking the position that a complaint potentially alleging coverage is not covered under a policy which provides that the insurer has the right and duty to defend any claims brought against the insured. State Farm & Fire Casualty Co. v. Martin, 186 Ill. 2d 367, 373 (1999); Murphy, 88 Ill. 2d at 451. The insurer must "(1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage." Employers Insurance of Wausau v. Ehlco Liquidating Trust, 186 Ill. 2d 127, 150 (1999); see also Murphy, 88 Ill. 2d at 451. Plaintiffs both reserved their rights under their reinsurance policy and Astro's direct insurance policy, and also sought a declaratory judgment to determine their obligations under both policies.

A brief review of Illinois law regarding an insurer's duty to defend is pertinent to our analysis here. An insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy. Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 107-08 (1992). If an underlying complaint alleges facts within

or potentially within coverage, the insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent. Hartford Fire Insurance, 321 Ill. App. 3d at 888. The insurer justifiably refuses to defend the insured if it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the cause within or potentially within coverage. Dixon Distributing Co. v. Hanover Insurance Co., 161 Ill. 2d 433, 439 (1994); Outboard Marine Corp., 154 Ill. 2d at 125; Hartford Fire Insurance, 321 Ill. App. 3d at 888. If several theories of recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy. Hartford Fire Insurance, 321 Ill. App. 3d at 888, citing Bituminous Casualty Corp. v. Fulkerson, 212 Ill. App. 3d 556, 564 (1991). "Furthermore, if the insurer relies on an exclusionary provision, it must be clear and free from doubt that the policy's exclusion prevents coverage." Hartford Fire Insurance, 321 Ill. App. 3d at 888.

In their abridged complaint for declaratory judgment, plaintiffs stated that "[t]he allegations asserted by UNDERLYING CLAIMANTS against BOEING raise significant issues as to whether this claim is covered under the terms and conditions of the insurance contracts." Furthermore, plaintiffs' complaint stated that "[t]he allegations asserted against Boeing [in the Underlying Action] suggest that the claim *may* fall outside of the coverage provided." (Emphasis added.) Thus, plaintiffs' complaint admits that the facts alleged against Boeing in the Underlying Action may also fall within, or potentially within, the applicable coverage provisions. The record also shows plaintiffs again admitted to the existence of common facts asserted in the Underlying Action that potentially fall within coverage during oral argument on Boeing's motion to stay proceedings.

In addition, plaintiffs' response to Boeing's motion to stay proceedings asserts that "the allegations of [Underlying Claimants in the Underlying Action] taken as true *appear to* squarely meet the terms of" certain policy exclusions in Astro's direct insurance policy regarding the failure "to meet the level of performance, quality, fitness or durability warranted" by Boeing. (Emphasis added.) Therefore, plaintiffs' response admits that their reliance on an exclusionary provision is not "clear and free from doubt that the policy's exclusion prevents coverage."

"The determination of rights and obligations under an insurance policy is a question of law for the court to decide." National Fire Insurance Co. of Hartford v. Kilfoy, 375 Ill. App. 3d 530, 534 (2007). Here, in the interest of judicial economy, we find as a matter of law that Plaintiffs have a duty to defend Boeing because plaintiffs admitted both in their pleadings and in their oral argument the existence of common facts alleged in the Underlying Action that bring the cause within or potentially within coverage. See Dixon Distributing Co., 161 Ill. 2d at 439; Outboard Marine Corp., 154 Ill. 2d at 125-26; Hartford Fire Insurance, 321 Ill. App. 3d at 888; see also Calloway v. Allstate Insurance Co., 138 Ill. App. 3d 545, 549 (1985) ("Allegations contained in a complaint are judicial admissions and are conclusive against the pleader"); Reis v. Aetna Casualty & Surety Co. of Illinois, 69 Ill. App. 3d 777, 785 (1978) (finding that the insurer had a duty to defend by admission conceded in its brief).

Even if we ignored plaintiffs' admissions, plaintiffs still have a duty to defend. A comparison of facts alleged in the Underlying Action and coverage within the direct insurance policy shows, for example, that Underlying Claimants assert that Thuraya D1 did not meet performance and functionality requirements. Astro's liability coverage, as assumed by plaintiffs, includes an exclusion for:

> "[D]amages claimed for the withdrawal, inspection, repair,
>
> replacement, modification, loss of use or restricted use of
>
> AIRCRAFT PRODUCTs or SPACECRAFT PRODUCTs or work

completed by or for the NAMED INSURED or any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use or subject to restricted use because of any known or suspected defect or deficiency therein."

Both the Underlying Action and plaintiffs' declaratory judgment action seek a factual determination of whether Boeing knew or suspected a defect involving Thuraya D1 and other related satellites within Boeing's 702 series. Therefore, a review comparing the allegations in the Underlying Action to the relevant provisions of the direct insurance policy also shows that the facts alleged against Boeing fall within, or potentially within, the policy coverage provisions, thereby triggering Plaintiffs' duty to defend. Outboard Marine Corp., 154 Ill. 2d at 125-26.

Having determined as a matter of law that plaintiffs have a duty to defend the original insured, Boeing, plaintiffs' remaining duty in their role as insurers is to indemnify. Thus, plaintiffs' roles both as reinsurers and insurers is to indemnify.

The duty to indemnify is narrower than the duty to defend. Outboard Marine Corp., 154 Ill. 2d at 127. "[T]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it." Outboard Marine Corp., 154 Ill. 2d at 127.

### F. Ripeness of Plaintiffs' Declaratory Judgment Action

"To maintain a declaratory judgment action, there must be an actual controversy between the parties capable of being affected by a determination of the case." Weber v. St. Paul Fire & Marine Insurance Co., 251 Ill. App. 3d 371, 372 (1993). Whether an action is considered "premature" or

unripe for adjudication focuses on an evaluation of the fitness of the issue for judicial decision at that point in time. Weber, 251 Ill. App. 3d at 372-73. Neither of the parties in this case raised the issue of whether plaintiffs' declaratory judgment action is ripe for adjudication, but we address it here as dispositive of the circuit court's judgment to grant Boeing's motion to stay proceedings.

In Weber, the reviewing court addressed whether, absent a finding of liability and a judgment for treble damages in the underlying action, a determination of the insurance company's obligation to indemnify is premature, regardless of which party brings the declaratory judgment action. There, the plaintiff brought a declaratory judgment action as executor of the decedent's estate. The decedent had wandered away from his nursing home and eventually died due to exposure to the elements. The plaintiff sought a declaration that the insurance policy issued by the defendant insurer on behalf of the nursing home included coverage for exposure to statutory treble damages. The circuit court granted the plaintiff's motion for summary judgment, finding that the policy included coverage for treble damages under the statute. On appeal, the defendant argued that the circuit court should have dismissed the declaratory judgment action for lack of an actual controversy.

Initially, the Weber court distinguished the defendant's argument as a question of ripeness rather than a question of standing to bring the declaratory judgment action. See also Stokes v. Pekin Insurance Co., 298 Ill. App. 3d 278, 281 (1998). The Weber court noted that the defendant did not challenge its duty to defend the insured in the underlying action. Instead, the defendant questioned whether it had a duty under its policy to indemnify the plaintiff if treble damages were awarded.

The Weber court then distinguished the issue of ripeness in cases involving the duty to defend in contrast to the duty to indemnify:

28

1-07-1667

"[T]he issue of a duty to defend is generally ripe for adjudication soon after the occurrence giving rise to the claim. Whether or not there is a duty to indemnify, however, does not arise until an insured becomes legally obligated to pay damages in the underlying action." Weber, 251 Ill. App. 3d at 373, citing Bituminous Casualty Corp., 212 Ill. App. 3d at 561.

See also Batteast v. Argonaut Insurance Co., 118 Ill. App. 3d 4, 5-6 (1983). In addition, the Weber court noted that "[a] declaratory judgment action is not intended to permit moot or hypothetical cases, or to enable parties to secure advisory opinions or legal advice from the court with respect to future difficulties, *i.e.*, there must be an actual controversy between the parties." Weber, 251 Ill. App. 3d at 373.

The Weber court held that the circuit court erred by denying the defendant's motion to dismiss the plaintiff's declaratory judgment action as premature, stating:

"[A] declaratory judgment action brought to determine an insurer's duty to indemnify its insured, brought prior to a determination of the insured's liability, is premature since the question to be determined is not ripe before adjudication of the underlying action." Weber, 251 Ill. App. 3d at 373-74, citing Bituminous Casualty Corp., 212 Ill. App. 3d at 561.

See also Batteast, 118 Ill. App. 3d at 5-6.

The court in Stokes also addressed the issue of whether the plaintiffs' declaratory judgment

29

action was premature prior to a finding of liability. The <u>Stokes</u> court first noted that an actual controversy "exists where there is a legitimate dispute admitting of an immediate and definite determination of the parties' rights, the resolution of which would help terminate all or part of the dispute." <u>Stokes</u>, 298 Ill. App. 3d at 280-81, citing <u>Dolezal v. Plastic & Reconstructive Surgery, S.C.</u>, 266 Ill. App. 3d 1070, 1083 (1994). The plaintiffs, as injured parties, sought declaratory judgment to determine whether the defendant insurer's $100,000 or $300,000 per-accident coverage limit applied. The circuit court granted the defendant's motion to dismiss the declaratory judgment action.

On appeal, the plaintiffs argued that the issue of liability in the underlying suit and the declaratory judgment action were entirely different and that none of the facts in one case would arise in the trial of the other. The <u>Stokes</u> court disagreed, stating that any declaratory judgment action as to whether the policy limit was above $100,000 would be meaningless if the underlying liability ultimately was determined to be greater than $100,000. The <u>Stokes</u> court emphasized the relevance of the declaratory judgment action as "integrally related to the underlying suit of liability." <u>Stokes</u>, 298 Ill. App. 3d at 284.

The <u>Stokes</u> court found that the plaintiffs' complaint failed to show an actual controversy because it contained bare allegations. For example, the plaintiffs' complaint alleged, " '[i]t is the position of the Defendant that their maximum limit of liability for all damages sustained by all parties is limited by the "Each Person" limit' and that [t]here is an actual controversy between plaintiffs and defendant, the resolution which will aid in the termination of the controversy or some part thereof.' " <u>Stokes</u>, 298 Ill. App. 3d at 284. In its holding, the <u>Stokes</u> court reasoned, "[i]f we

were to find an 'actual controversy' based upon the bare allegations in plaintiffs' complaint, we must find an 'actual controversy' in every complaint which seeks a declaratory judgment as to liability limits, even if there is little chance that liability will ultimately exceed the disputed limits." Stokes, 298 Ill. App. 3d at 284. The Stokes court affirmed the circuit court's decision to dismiss the plaintiffs' declaratory judgment action as premature. Stokes, 298 Ill. App. 3d at 284-85.

In the instant case, plaintiffs both agreed to and admitted their duty to defend under the direct insurance policy and we determined plaintiffs' duty to defend as a matter of law. As in Weber and Stokes, the duty to indemnify remains as the only issue for resolution in plaintiffs' declaratory judgment action. The duty to indemnify cannot be defined in this case until adjudication of the Underlying Action. Furthermore, as in Stokes, plaintiffs' abridged complaint for declaratory judgment contains bare allegations lacking detail as to their own claim and an actual controversy. Plaintiffs alleged that "[a]n actual, ripe and justiciable controversy exists between UNDERWRITERS, ASTRO and BOEING regarding UNDERWRITERS' obligations, if any, under the contracts of insurance and reinsurance," but provided no details as to how or why their claims were actual, ripe or justiciable. Instead, the gist of plaintiffs' complaint consisted of an effort to obtain information relevant to their coverage investigation. Plaintiffs' abridged complaint for declaratory judgment, essentially, amounted to a request for discovery, which does not qualify as "a legitimate dispute admitting of an immediate and definite determination of the parties' rights, the resolution of which would help terminate all or part of the dispute." Stokes, 298 Ill. App. 3d at 280-81, citing Dolezal, 266 Ill. App. 3d at 1083.

In this case, because the issue of liability in the Underlying Action has not been adjudicated

31

and plaintiffs' abridged complaint for declaratory judgment failed to show that the underlying facts and issues of the case are not premature, we find from a procedural standpoint that the circuit court did not abuse its discretion by granting Boeing's motion to stay proceedings. Furthermore, the circuit court could not abuse its discretion where the complaint before it was not ripe for adjudication. As a result of our findings, we need not reach the issue of whether Boeing was required to prove the elements of collateral estoppel to meet its burden of proof for its motion to stay proceedings.

Plaintiffs insist that whether the issues in both cases overlap is not dispositive and the litmus test is only whether collateral estoppel would apply to the Underlying Action from a ruling in the declaratory judgment proceedings, following Murphy, 88 Ill. 2d at 455. As the arbitration before the International Chamber of Commerce in Paris applies the civil law system of the UAE and that law does not recognize the principle of collateral estoppel, the holding in Murphy would provide a basis for denying the motion to stay.

We find that Murphy is applicable only in regard to its finding that a declaratory judgment is an unacceptable vehicle of litigation where the issues in the underlying suit and the declaratory judgment action are substantially the same. Murphy, 88 Ill. 2d at 455. Otherwise, Murphy is inapplicable to the instant case because, there, the issue before the supreme court was whether the insurer waived its policy defenses to a garnishment suit when the insurer failed to either defend its insured or seek a judgment declaring that it had no duty to defend. Likewise, this court's holding in Home Insurance Co. of Illinois v. Hooper, 294 Ill. App. 3d 626 (1998), is inapplicable because, in that case, the indemnification issues set forth in the declaratory action involved purely legal issues

and were not in any way reliant upon facts to be presented in the underlying action. In addition, Home Insurance Co. is not applicable because the insurer denied that it had a duty to defend.

### G. Undue Prejudice Warrants a Stay

We also hold that the circuit court did not abuse its discretion from a substantive standpoint because Boeing satisfied its burden of proof that a stay was warranted based upon the undue prejudice that would result if discovery were allowed. Plaintiffs' claim for declaratory judgment raises an issue not presented by the facts in Weber, Stokes or Batteast. Those cases did not involve discovery complications as in the instant case.

Here, what prompts plaintiffs' declaratory judgment action is the objective to establish disputed factual issues through discovery in order to circumvent the strict discovery rulings made in the Underlying Action and use the restricted information to the prejudice of Boeing. Although plaintiffs relinquished their control over and agreed to fund the defense of the Underlying Action, they persist in their efforts to gain access to information from Boeing that overlaps with the issues to be resolved in the Underlying Action, including information regarding alleged intentional conduct pertinent to both the Underlying Action and the coverage determination.

In this case, if the circuit court permitted discovery in the declaratory judgment action prior to the resolution of the Underlying Action, plaintiffs would then be allowed to "lay the groundwork" for both a later denial of coverage and circumvent the discovery rulings made in the Underlying Action. This result unfairly would benefit the dual-role Reinsurers participating both as plaintiffs in this case and as Underlying Claimants.

"An insurer has a duty of fairness to its insureds and may not put its own interest ahead of

33

the protection of its insureds." RLI Insurance Co. v. Illinois National Insurance Co., 335 Ill. App. 3d 633, 647 (2002). In addition to the duty to defend, "[a]n insurer owes its insureds a duty of fair dealing and has no right to manipulate an action in order to excuse itself from protecting its insureds." RLI Insurance, 335 Ill. App. 3d at 647. "The declaratory judgment procedure was designed to settle and fix rights before there has been an irrevocable change in the position of the parties that will jeopardize their respective claims of right." First of America Bank, Rockford, N.A. v. Netsch, 166 Ill. 2d 165, 174 (1995).

In this case, it appears that plaintiffs seek declaratory judgment, not to settle and fix rights, but instead to use as a sword to obtain the discovery that Underlying Claimants, including certain plaintiffs, were precluded from obtaining in the Underlying Action. A declaratory judgment action should not be used to force the parties to have a "dress rehearsal" of an important issue expected to be tried in the injury suit. See Bituminous Casualty Corp., 212 Ill. App. 3d at 562. The timing of plaintiffs' declaratory judgment action, with the underlying objective of obtaining discovery from Boeing, suggests that plaintiffs are engaged in gamesmanship in order to gain a tactical advantage in the Underlying Action, to the detriment of Boeing.

"A declaratory judgment action is used ' "to afford security and relief against uncertainty *with a view to avoiding litigation, rather than in aid of it*." ' " (Emphasis in original.) Stokes, 298 Ill. App. 3d at 281, quoting Dolezal, 266 Ill. App. 3d at 1083, quoting City of Chicago v. Department of Human Rights, 141 Ill. App. 3d 165, 169-70 (1986). Here, if the plaintiffs' declaratory judgment action were to proceed, they unfairly would benefit from discovery of information that is at the heart of the dispute in the Underlying Action. The record is replete with plaintiffs' requests from Boeing

for information mirroring Underlying Claimants' discovery requests that were denied by the international arbitration tribunal. For example, Underlying Claimants, some of which are plaintiffs in the instant declaratory judgment action, requested from Boeing all documents relating to the contract signed between Thuraya and BSSI, as well as all documents relating to the sale of Hughes to Boeing. The record also shows plaintiffs requested from Boeing contracts with amendments for the 702 series satellites that originally included the SCA at issue and information about the negotiation and accommodation in sales price of Hughes.

Again, the issue of collateral estoppel is not applicable here because we are not concerned whether a ruling in plaintiffs' declaratory judgment action would be binding on the Underlying Action. Our concern involves plaintiffs' efforts to gain access to information by discovery that could aid them in the litigation of ultimate issues prior to the resolution of the Underlying Action, that later would affect the coverage determination. The record supports Boeing's allegations of prejudice, specifically considering that one of the ultimate issues for resolution in the Underlying Action is Boeing's alleged intentional conduct. By virtue of the interrelation of various issues involved in the litigation between plaintiffs and Boeing and Underlying Claimants and Boeing, we find that the circuit court substantively did not abuse its discretion by granting Boeing's motion to stay proceedings until the resolution of the Underlying Action.

Accordingly, the judgment of the circuit court of Cook County to order a stay of plaintiffs' abridged complaint for declaratory judgment is affirmed.

Affirmed.

GREIMAN and CUNNINGHAM, JJ., concur.

1-07-1667