In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 23-1854

GREAT AMERICAN INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

STATE FARM FIRE AND CASUALTY COMPANY,

*Defendant-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-03765 — **Thomas M. Durkin**, *Judge.*

―――――――――――

ARGUED DECEMBER 8, 2023 — DECIDED JUNE 24, 2024

―――――――――――

Before SYKES, *Chief Judge,* and RIPPLE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Great American Insurance Company (Great American) and State Farm Fire and Casualty Company (State Farm) disagree about who had the duty to pay the defense costs of an underlying lawsuit against board members at the College of DuPage. For most claims, it is undisputed that Great American's assignor provided primary insurance coverage and State Farm provided umbrella or

excess coverage, but the parties dispute whether this was true for all claims. Great American sued State Farm to recoup losses from defense costs that it claimed State Farm had the duty to provide on behalf of one board member. The answer to this dispute lies in the plain language of the insurance contract which provides that State Farm would pay defense costs only for losses covered by its policy, but not covered by any other insurance policy. We conclude, as did the district court, that the primary policy provided by Great American's assignor covered the underlying loss, and therefore, pursuant to the terms of State Farm's policy, it had no duty to provide defense costs. We therefore affirm the decision of the district court.

## I.

In 2015, Robert Breuder, the former president of the Community College District No. 502, DuPage County, Illinois (the College of DuPage) sued the Board of Trustees ("Board") and certain of its members, including Kathy Hamilton, after the Board terminated his employment. In this underlying federal court suit, Breuder alleged that he was harmed by defamatory statements implying that he engaged in unprofessional and unethical conduct, as well as by the Board's actions of placing him on administrative leave, and later terminating him without adequate notice or an opportunity to be heard. He alleged that these Board actions damaged his reputation, caused him to lose other employment opportunities, and humiliated him. His complaint did not specify which of the Board's acts caused which of the injuries.

Breuder's complaint set forth a multitude of claims under federal and state law, including two federal claims under 42 U.S.C. §1983 against all the defendants in their personal and

official capacities, alleging the deprivation of property and liberty interests in his employment without adequate due process. Three other claims alleged that the individual defendants violated state laws related to civil conspiracy, tortious interference with contract, and defamation. Finally, Breuder alleged one state law claim for breach of contract against the Board alone.

In response to the defendants' motion to dismiss, the district court judge in the underlying action denied the motion as to the breach of contract and §1983 claims, but dismissed all the claims against the individual defendants except the defamation claims made against the Board members in their personal capacity based on statements made to the media. After several years of litigation, the parties reached a settlement agreement in 2022, in which Breuder agreed to dismiss all pending claims in exchange for $4 million. The settlement agreement did not apportion this payment among the legal claims Breuder had asserted in the litigation or among the various injuries he had alleged.

When Breuder filed his suit in 2015, the College of DuPage and its employees were insured under a policy issued by the Illinois Community College Risk Management Consortium (Consortium). The policy indemnified the insureds—the Board and its members—for losses due to legal liability for employment practice violations such as discrimination, wrongful termination, libel, slander, defamation, and violation of civil rights, among other things.

The Consortium policy required that the insurer pay the "Ultimate Net Loss" covered under the policy—that is, "the total sum which the Member is obligated to pay, because of loss or damage covered under any Section of [the policy],

either through adjudication or compromise." R. 6-2 at 24,
¶23.[1,2] Under the terms of the policy, this total sum included,
among other things, "expenses of lawyers … and other per-
sons for litigation, settlement, adjustment and investigation of
Suits which are paid as a consequence of any loss or damage
covered" by the policy. *Id.* The policy also provided that the
Consortium could, in its discretion, "advance payments" be-
fore the Ultimate Net Loss was reached. *Id.* at 14, ¶9. In short,
the Consortium policy did not include a duty to defend a suit,
but rather an obligation to pay legal fees as part of an in-
sured's total net loss.

Kathy Hamilton was a member of the Board of Trustees of
DuPage College during the relevant times of this litigation. As
a member of the Board, she was insured under the Consor-
tium policy. She was also insured under a personal liability
umbrella policy issued by State Farm which indemnified
Hamilton for personal liability damages in certain circum-
stances. That policy contained an "Other Insurance" clause
stating that "[t]he coverage provided by this policy is excess
over all other insurance and self insurance." R. 6-3 at 16, ¶12.

The State Farm policy provided "Personal Liability" in-
demnity coverage as follows:

---

[1] Page number references are to the district court record page numbers
stamped at the top of the page by the district court.

[2] The Consortium policy indicates that a word or term is a defined
term in the contract by using all capital letters and bold font. The State
Farm policy indicates that a word is a defined term by using bold font. In
order to avoid distraction, and distinguish between defined terms and our
own emphases, we indicate defined terms by capitalizing the first letter(s)
of the word or term.

> If a claim is made or suit is brought against an Insured for damages because of a Loss for which the Insured is legally liable and to which this policy applies, [State Farm] will pay on behalf of the Insured, the damages that exceed the Retained Limit.

R. 6-3 at 11.

The policy defined "Loss" as (among other things) "the commission of an offense which first results in Personal Injury during the policy period." *Id.* at 7, ¶7. And it defined "Personal Injury" as (among other things) "injury other than Bodily Injury arising out of … libel, slander, [or] defamation of character." *Id.* at 7, ¶8. In short, at least as far as the subject matter was concerned, both the State Farm and the Consortium's policies addressed the loss from the Breuder litigation.

The heart of the dispute here comes down to an interpretation of the Defense Provision of State Farm's policy. That provision stated, in relevant part:

> If a suit is brought against any Insured for damages because of a Loss to which this policy applies, we will provide a defense to the Insured at Our expense by counsel of Our choice **when the basis for the suit is a Loss that is not covered by any other insurance policy but is covered by this policy.**

Id. at 11 (emphasis ours).

After Breuder sued, Hamilton informed State Farm of the litigation, and later, that the Consortium had agreed to provide a defense to the defendants pursuant to a reservation of rights. Subsequently, State Farm sent Hamilton its own

reservation-of-rights letter setting forth its position that, in light of the Consortium's involvement, the litigation did not trigger State Farm's defense obligation.

Eventually the parties settled the Breuder suit, and the Consortium indemnified the underlying settlement, covering the defendants' loss, including legal fees. Before the suit settled, however, the Consortium assigned to Great American all its Breuder-litigation-related rights, claims, and causes of action as against State Farm. In short, Great American acquired the right to sue State Farm to recoup some or all of the costs of the defense of the underlying Breuder litigation against Hamilton, which it did in July 2022, in this federal diversity suit.

In its complaint in the district court in this case, Great American alleged that State Farm breached its duty to defend Hamilton. Specifically, Great American sought a declaration that, among other things, (1) the Consortium had "made compulsory payments exceeding its fair share of the purported common obligation or burden of defending Hamilton in the Underlying Lawsuit," and (2) the Consortium (and now Great American as its assignee) was "entitled to recoup from State Farm a "fair and proportionate share of all defense costs and expenses that it has paid on behalf of Hamilton in the Underlying Lawsuit." R. 6 at 16, ¶5–6. Great American also asserted a claim of estoppel, seeking a declaration that because State Farm had not defended Hamilton under a reservation of rights or sought a judgment that it had no duty to defend her

in the Breuder litigation, State Farm was estopped from raising defenses to coverage.[3]

We review the district court's grant of State Farm's motion to dismiss de novo. *Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 994 (7th Cir. 2023). The district court rejected Great American's arguments that the language of the State Farm insurance contract was ambiguous and concluded that, under the plain language of the umbrella policy, "[b]ecause the Consortium covered the only loss at issue, that loss was 'covered by any other insurance policy,' as provided in the State Farm policy. And because the loss was covered by an insurance policy other than State Farm's, State Farm has no liability for the costs of the defense." R. 30 at 4. The district court also rejected Great American's claim that State Farm's coverage was primary as it related to Hamilton's liability for conduct committed in her individual capacity. And because State Farm did not have a duty to defend Hamilton, the district court held that Great American's other claims also failed and entered judgment for State Farm. Great American timely appealed.

Because both parties spend some time on matters that appear to be undisputed, we begin with the following summary of a few matters we do not need to untangle: As a member of the Board, Hamilton was insured by the Consortium policy for, at least, some matters. The members insured by the Consortium policy suffered a loss. The loss they suffered was related to conduct whose subject matter was potentially

---

[3] Great American also asserted claims for equitable contribution, contractual subrogation, and equitable subrogation—claims that are not part of this appeal.

covered both by the Consortium and State Farm policies—defamation, employment wrongs, and civil rights violations. The Consortium policy did not include a duty to defend, but rather required the insurer to pay the total amount of the insureds' loss, including for legal fees. The Consortium was responsible for indemnifying members for the loss incurred from the underlying settlement of the Breuder litigation, and did, in fact, indemnify that loss. The duty to defend is assessed at the beginning of a lawsuit before anyone can know if there is a loss. Net loss can only be determined at the end of a lawsuit or settlement. State Farm's policy included a duty to defend in certain circumstances.

## II.

In reviewing the district court's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we look to see whether Great American's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The interpretation of an insurance policy is a matter of state law, and because the parties agree that Illinois law applies, we look there for guidance. *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015).

The parties spend some time arguing over whether the State Farm policy was an excess or umbrella policy across the board, or whether it acted as a primary policy for some purposes—such as in the duty to defend Hamilton. Typically, a primary policy covers the first dollar of an insured's loss. *See, e.g., Lamorak Ins. Co. v. Kone, Inc.*, 2018 IL App (1st) 163398, ¶27. An excess insurance policy, on the other hand, "attaches only after [the] primary insurance … has been exhausted."

*Kajima Constr. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 313 (Ill. 2007) (internal citation omitted). Ordinarily, because a primary insurance policy provides the insured with the first level of protection, it typically assigns to the insurer not only a duty to indemnify for any loss, but also a duty to defend the insured. *Lamorak,* 2018 IL at ¶28. And in the usual course of events, the excess policy follows the underlying coverage and does not broaden it, but simply, "increases the amount of coverage available to compensate for a loss." *West Bend Mut. Ins. Co. v. DJW-Ridgeway Bldg. Consultants, Inc.*, 2015 IL App (2d) 140441, ¶34 (citation omitted). An umbrella policy provides both excess coverage, and in some circumstances may provide broader coverage than that otherwise provided by the underlying primary carrier. *Kajima*, 227 Ill. 2d at 115.

Of course, what animates the desire to distinguish between primary and excess coverage is cost and risk. Umbrella or excess insurers take on less risk, as they place reliance on the fact that the primary insurer will ordinarily be the one responsible for indemnifying most losses or paying defense costs. Consequently, insureds generally pay less in premiums for excess or umbrella insurance than they do for primary coverage. *See generally Ill. Emcasco Ins. Co. v. Cont'l Cas. Co.*, 487 N.E.2d 110, 112 (1985) (explaining the role of umbrella coverage and how "the premiums generally charged for umbrella coverage also reflect[] an intent that umbrella policies serve a different function" than primary coverage). Nevertheless, whatever ordinarily happens in insurance contracts, our "primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Galarza v. Direct Auto Ins. Co.*, 2023 IL 129031, ¶38.

Great American objects to labelling State Farm's policy as a per se excess or umbrella policy, as part of its theory of the case is that the State Farm policy required State Farm to provide primary coverage where there was no underlying insurance. And Great American argues that the provision of defense costs for Hamilton was just such an instance. We are not concerned with the labels—primary, excess, or umbrella—however, but rather with the expectations of the parties—that is, what each insurer has agreed to cover in the respective policies. Regardless of what the usual primary policy or the usual umbrella policy provides, as with any other contract, the parties to an insurance agreement have the power to define the terms, including the limits of the defense obligations. *Vill. of Lombard v. Intergovernmental Risk Mgmt. Agency (IRMA)*, 681 N.E.2d 88, 92 (Ill. App. Ct. 1997). *See generally Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (2001) (explaining that a court must interpret an insurance contract by giving effect to the intent of the parties to the contract).

This means that we can eschew the labels and just look to State Farm's contract with Hamilton. In doing so, "we 'must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Westfield*, 796 F.3d at 778 (*quoting Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1078 (1993)).

Our analysis of the State Farm agreement begins with the indemnity provision which obligates the insurer to indemnify Hamilton for a personal liability "Loss" only to the extent that damages for the "Loss" exceed the "Retained Limit" which is the "amount paid or payable by any other insurance policy."

R. 6-3 at 9, ¶14, and 11. In common parlance, State Farm will only cover loss not covered by another insurer. The most illuminating language, for purposes of this decision, comes from the Defense Provision, which provides that State Farm will defend Hamilton in a suit seeking damages for a personal-liability loss only if the basis for that suit is a loss that "is covered by [State Farm's] policy" but "is not covered by any other insurance policy." *Id.* at 11.

That language makes our task simple. We merely have to look to see whether any other insurance policy covered the potential loss. In plain language, we ask, "was there another insurance company potentially on the hook?" If yes, State Farm had no duty to defend. If no, it was required to defend against that loss. In this case we conclude that the Consortium policy covered the potential loss. Great American concedes that the Consortium was responsible for indemnifying the members for the loss incurred from the Breuder litigation. Great American Br. at 41 (stating that Great American does not seek to shift the loss for the underlying settlement to State Farm); Reply Br. at 7 (agreeing that the Consortium policy potentially covered the underlying action and noting that this is why the Consortium ultimately indemnified the underlying settlement). Because the Consortium policy covered the only loss at issue, that loss was "covered by any other insurance policy" as provided in the State Farm agreement, and therefore State Farm had no liability for the costs of the defense.

That should be the end of the story. Great American, however, raises several arguments that we will address, including an objection to State Farm's insertion of the word "potential" into the language of the Defense Provision. That is, State Farm and the district court have discussed the Defense Provision,

either explicitly or implicitly as though it has the word "potential" written in as below:

> If a suit is brought against any Insured for damages because of a Loss to which this policy applies, We will provide a defense to the Insured at Our expense by counsel of Our choice when the basis for the suit is a [potential] Loss that is not covered by any other insurance policy but is [potentially] covered by this policy.

*See* State Farm Br. at 22–26, and R. 6-3 at 11. Contrary to Great American's argument, this addition does not indicate an ambiguity in the original language, it simply reflects the inherent nature of a defense provision in an insurance contract. Defense provisions depend on an analysis of potential loss because, of course, at the time an insurer is assessing its duty to defend—at the start of a lawsuit—it cannot know whether its insured will suffer a loss through adjudication or settlement. This is the very premise of insurance. It is based on potentialities.

Great American does not disagree. In fact, it dedicates several pages to describing the duty to defend, noting that it requires an analysis of potential loss. This is what Great American has to say about the duty to defend:

> The duty to defend is broad, arises at the outset of the underlying action, and exists where the alleged facts create *the mere **potential*** for coverage. *Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 & 165, 828 N.E.2d 1092, 1098 & 1103 (2005); *United Servs. Auto. Ass'n v. Dare*, 357 Ill. App. 3d 955, 961, 830

N.E.2d 670, 675 (2005). If the alleged facts **potentially** fall within coverage, reading the allegations liberally, the duty to defend is triggered. *Nationwide Prop. & Cas. Ins. Co. v. State Farm Fire & Cas. Co.,* 2022 IL App (1st) 210267, ¶ 24; *see also United Servs. Auto. Ass'n,* 830 N.E.2d at 678 (noting that "the threshold for pleading a duty to defend is low"). This is true even if the allegations are groundless or false, even if the insurer may have no duty to indemnify, and even if only one of several theories of recovery is **potentially** covered. *Gen. Agents,* 828 N.E.2d at 1098; *Certain Underwriters at Lloyd's, London v. Boeing Co.,* 385 Ill. App. 3d 23, 39, 895 N.E.2d 940, 954 (2008).

Great American Br. at 23–24 (italics in original; boldface ours). We agree. The duty to defend is a broad one and usually arises not just when the allegations of the underlying complaint "fall within … the policy's coverage," but also when those allegations "potentially" fall within that coverage. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1208, 1220 (Ill. 1992) (emphasis omitted). In short, the duty to defend depends on an analysis of the potential for loss.

To assess whether State Farm had a duty to defend, therefore, we must look to the language of its policy to see if the Breuder complaint raised claims that could potentially cause a loss that fell within State Farm's coverage. The language of the State Farm contract is clear that a claim potentially falls within the coverage if it meets the following two requirements: First, the "basis for the suit is a Loss that is … covered by this policy." R. 6-3 at 11. This is an obvious point. An

insurer will not provide a defense to a lawsuit about a slip and fall in the home, for example, where the policy covers only injuries related to automobile accidents. Second, and far more importantly for our purposes, the loss must be one that is "not [potentially] covered by any other insurance policy." *Id.*

Great American spends some time in its brief proving the first point—that the subject matter of the underlying Breuder suit was such that State Farm potentially covered the loss. *See* Great American Br. at 29–38. But State Farm concedes that this is true, so we need not belabor this point. *See* State Farm Br. at 26 ("State Farm agrees that its umbrella policy potentially covered the Breuder 'Loss,'" *citing* R. 14 at 15–16, ¶60). Nevertheless, as State Farm points out, this is only half of the inquiry. The resolution of this case hangs on the second requirement. State Farm owed a duty to defend only if the basis for the Breuder suit was a "Loss" that was "not [potentially] covered by" another policy. R. 6-3 at 11 (emphasis added). In other words, the language of State Farm's insurance contract linked its duty to defend to the primary insurer's potential indemnity coverage. Stated another way, State Farm's potential defense coverage depended on and was linked to the Consortium's potential indemnity coverage. For this reason, assessing State Farm's duty to defend requires an additional layer: assessing the Consortium's duty to indemnify.

We have already noted that Great American concedes, as it must, that "the [Consortium] policy 'potentially' covered the underlying action." Great American Reply Br. at 7. The Consortium policy indemnified the insureds for losses from the very kinds of employment practice violations, defamation torts, and civil rights violations that Breuder alleged in his complaint. Great American argues instead that its own

potential coverage is irrelevant: "The reason [the Consortium] owed no duty to defend is not because the underlying complaint's factual allegations were outside the scope of coverage, but because [the Consortium] did not contractually agree to defend any claims at all." Great American Reply Br. at 8 (original emphasis omitted). It is true that the Consortium did not contractually have a duty to defend, only a right to participate in the defense and an ultimate duty to indemnify the net loss which included legal fees. This, however, is neither here nor there. State Farm's duty to defend did not depend on whether the Consortium had a duty to defend or not. It is possible that no insurance company had a duty to defend at all. *See Keystone*, 456 F.3d at 762 (discussing how the duty to defend and the duty to indemnify can be linked, but also how they can, by contract, be separate and independent duties); *Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 421 (7th Cir. 2005) (describing the distinction between the duty to defend and the duty to indemnify and noting that "while the duty to indemnify may sometimes nest inside the duty to defend, that will not always be the case."). The language of the policy makes clear that State Farm's duty to defend was linked to the Consortium's duty to cover a loss, not the Consortium's duty to defend. The Consortium's duty to defend, or not, therefore was irrelevant to the assessment of whether State Farm had a duty to defend.

State Farm could have contracted to premise its duty to defend on the absence of any other insurer's duty to defend. This was the case in *Indemnity Insurance v. Westfield Insurance,* where Indemnity's insurance agreement stated, "we will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.'" *Indem. Ins. Co. of N. Am. v. Westfield Ins.*

*Co.*, 58 F.4th 276, 281 (7th Cir. 2023). State Farm had the option to write a similar insurance contract, premising its duty to defend on the absence of any other insurer doing so. "The parties to an insurance contract can incorporate in it such provisions, not in violation of law, as they choose." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1095 (2007) (*quoting Pioneer Life Ins. Co. v. All. Life Ins. Co.*, 30 N.E.2d 66, 73 (1940)). This includes the power to define the limits of the duty to defend. *Sheckler v. Auto-Owners Ins. Co.*, 2022 IL 128012, ¶25 (*quoting Zurich Ins. Co. v. Raymark Indus., Inc.*, 514 N.E.2d 150, 161 (Ill. 1987) (explaining that "[t]he insurer's duty to defend its insured arises from the undertaking to defend as stated in the contract of insurance.")). Consequently, State Farm could have contracted to limit defense coverage or link it to other provisions in any number of ways. An insurer could, for example, agree to provide defense costs for automobile accidents, but not for defamation. In short, no matter how broad a duty to defend might be, it is still limited by the terms of the insurance contract to which the parties agreed. And thus we circle right back to where we started—the language of the contract in which State Farm linked its duty to defend, not to another insurance company's absence of a duty to defend, but to whether another insurance policy potentially covered the loss.

For this reason, Great American's arguments about the distinction between the duty to indemnify and the duty to defend are beside the mark. It is true that these duties are distinct and command different obligations at different times. *Sokol*, 430 F.3d at 421 (applying Illinois law and noting that "[t]he two duties of the insurer—defense and indemnification—are distinct"). But as we just noted, the parties can contract to provide a duty to defend however they wish. *See Rich*,

875 N.E.2d at 1095; *Zurich Ins. Co.*, 514 N.E.2d at 161. And in this case, State Farm contracted to link its duty to defend to the Consortium's lack of a duty to indemnify the loss.

We can also lay to rest Great American's argument that there is "no other insurance to which State Farm's 'other insurance' clause could apply." Great American Br. at 40. Great American's argument seems to be that, at the start of the Breuder suit, when State Farm was obligated to assess its duty to defend, there was no "other insurance" covering the loss, because the Consortium's duty to indemnify "did not arise until the settlement occurred." *Id.* Again, Great American identifies a truism about insurance law, but one that does not apply here. The duty to indemnify arises once an insured has incurred a liability in the underlying claim against it. *Outboard Marine*, 607 N.E.2d at 1221. All parties agree that the Consortium had both the potential duty to indemnify at the start of the suit, and ultimately did indemnify the loss from the underlying settlement. As we explained above at length, however, when assessing a duty to defend, a court looks at potentialities. At the time State Farm was assessing its duty to defend, the Consortium potentially covered the loss (and ultimately did cover the loss). The ultimate determination of the indemnity obligation therefore was irrelevant.

## III.

Because State Farm had no duty to defend at the outset of the underlying Breuder litigation, we need not address Great American's argument that State Farm is now estopped from raising coverage defenses, and any remaining arguments are likewise inapplicable. The judgment of the district court is therefore AFFIRMED.